## ULYSSES S. BYRNE, Repondent, v. NEWS CORPORATION and ROBERT I. YOUNG, Appellants.

Kansas City Court of Appeals, November 27, 1916.

1. **LIBEL AND SLANDER:** Ambiguous Article: Reference to Plaintiff: Understanding of Readers: Instructions. Where the article complained of as libelous does not refer to plaintiff by name and is ambiguous either as to its meaning or as to the person to whom it applies, and there is no admission on the part of defendants, either in their pleading or evidence, that readers of the aticle

would understand it as applying to plaintiff, the jury should be required to pass on the question whether readers understood the article as referring to plaintiff. And an instruction covering the case and directing a verdict without including such issue was erroneous. If readers would not understand that the article referred to plaintiff, then there was no libel as to him, the gravamen of an action for libel not being injury to the plaintiff's feelings but damage to his reputation in the eyes of others.

2. ——: ——: ——: ——: ——. Such being the gravamen of the action, it is enough to constitute libel that defendants knew of whom they were writing but others who read the article must have reasonably understood that plaintiff was the man referred to, and some proof thereof must be made.

3. ——: ——: ——: ——: ——. Where the libelous article did not refer to plaintiff by name and did not show on its face whom it referred to, an instruction telling the jury there was but one issue, namely, whether the article was true or false, was erroneous, since it omitted the issue of whether readers of the article would reasonably understand that plaintiff was the one referred to.

4. ——: ——: Innuendo: Following Same. Plaintiff's instruction was not erroneous in not requiring the jury to specifically find according to the *innuendo* where, from the answers of the defendants as well as from their evidence, it is manifest that there is no dispute as to the meaning of the words as fixed by the *innuendo*, namely, that by filing a false pedigree of swine with a registry association the crime of making false, forged and untrue pedigrees was committed (a misdemeanor under Sec. 4589, R. S. Mo. 1909.)

5. ——: Trial: Instructions: Reference to Plaintiff. In an action for libel an instruction submitting the question of libel should explicitly tell the jury the precise statement in the article claimed to be false, and, if false, libelous; and should not instruct them in such general terms that if they believed the "publication complained of" was false and libelous, they should return a verdict for plaintiff. For the jury should not be required to refer to the pleading to ascertain what the precise statement is that they must find to be false in order to constitute libel. And, as the jury can consider the whole article in determining whether the alleged false statement relied upon is a libel, the jury might think that if any part of the article was false the same was libelous although the part they thought was libelous might not be the particular part declared on as libelous.

6. ——: ——: ——. In an action for libel against one who wrote and another who published an article charging an offense on plaintiff's part, the jury may award punitive damages to the same extent against both defendants where one is guilty of actual malice and the other of implied malice only. But in this

case it was conceded that the paper was not guilty of actual malice and there was evidence that the individual defendant was guilty of actual malice. And as the jury had been told of the different kinds of malice and that if they found malice of any kind they could allow punitive damages, it was error to charge in other instructions that punitive damages are allowed where the wrongful acts of the defendant have been characterized by *ill will* and such damages are for punishment and to caution the defendant against repeating such acts, and that therefore, if the jury should find the publication was made maliciously as thus defined, they should allow such punitive damages as they think the defendants should be punished. This was an implied instruction to the jury to fix the amount of punitive damages to be assessed against both with reference to the actual malice of one defendant rather than with reference to the legal malice of the other. Such invitation should not be given in view of the, fact that the natural tendency is to allow greater punitive damages for actual malice than for malice that is implied in law, and there cannot be but one amount of punitive damages assessed and that against both defendants.

7. ———: **Offer of Retraction: Mitigation.** An offer to print any statement or explanation plaintiff cared to make, which offer was made by the paper after suit was brought, came too late to be considered in mitigation of damages as an offer of retraction, even if it were such, which it is not.

8. ———: **Malice in Law: Punitive Damages.** If the charge contained in communication to a newspaper is false and is such as to constitute a libel, and the newspaper publishes said communication, such paper cannot necessarily escape the charge of being guilty of malice in law merely by showing that without negligence and in good faith it published the article believing it to be true and with good grounds for such belief. Hence defendant newspaper is not entitled to instructions stating that, under such circumstances, the jury cannot find punitive damages. For, in Missouri, in an action for libel, the jury may award punitive damages based merely on malice implied by law and need not find actual malice in order to award punitive damages.

9. ———: **Evidence: Witnesses: Corroboration: Private Memoranda.** In an action for libel against a newspaper and a party who wrote a letter to its public forum, the letter charging plaintiff with obtaining the registration of hogs by forging pedigrees, the notations appearing on the individual defendant's private hog register, as to disposition of certain pigs, were properly excluded, where its only purpose was to corroborate defendant's testimony to the facts shown by them.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen*, Judge.

REVERSED AND REMANDED.

*Lucian J. Eastin* and *Culver & Phillip* for appellants.

*Randolph & Randolph* for respondent.

TRIMBLE, J.—This is an action for libel. Defendant, Robert I. Young, is a farmer near St. Joseph, and defendant, News Corporation, publishes a daily (except Sunday), newspaper in said city, called "The St. Joseph News-Press" which has a circulation of 40,000 copies a day, covering not only the city but also Northwest Missouri, Eastern Kansas and Southern Iowa. Plaintiff resided near said city and was a breeder and seller of pure-bred pedigreed and registered Poland China hogs. These pedigrees, the petition alleged, he registered in the Herd Register of the Standard Poland China Record Association having its headquarters at Maryville, Mo., and the pedigrees thus registered were furnished by him to buyers of his animals.

A column called "The People's Forum" was maintained in said paper wherein individuals might express their opinions on current topics or anything else that was fit for publication and not abusive. The defendant Young wrote an article, or communication in the form of a letter, to the Editor and sent it through the mail for publication in said column, and it duly appeared therein on September 18, 1914. Plaintiff thereupon brought this suit. Said article is here set forth in full, the portion thereof charged to be and declared on as libelous being put by us in italics, as follows:

St. Joseph Stock Breeder's View of the Fair.

Editor News-Press: In an editorial appearing in your much esteemed paper you say: 'Our own dairymen did not exhibit because they were afraid they would be outclassed by the non-resident exhibitors.' I know it to be a fact that there are three herds of dairy cattle within two miles of the city limits of St. Joseph, Mo., that won more prizes at the World's Fair, St. Louis, Mo., than any three herds in the United States. Then

why say we are afraid to exhibit at a tri-state fair? I can pick an exhibition herd from these three herds that, with any kind of a fair man for judge, can win against the whole world.

"We want a tri-state or national fair at St. Joseph if the citizens of St. Joseph have a mind to back it up. St. Joseph is too big a town to fall back into the county fair business. The fair association has made a few mistakes and this reminds us that they who make no mistakes never made much of anything.

I exhibited at a fair last year, and when the cattle were led out into the show ring I made the discovery that I had very strong competition. Not that the other exhibitor had better cattle than I had, but the judge who, by the way was also imported, was none other than a partner of my strongest opponent. When the show was over the judge (?) came to me and said: 'You have a very choice heifer there, and I am sorry she did not win first. What will you take for her? A price was named—he bought the heifer, and in ten minutes afterward made the statement to a friend of mine that she was the best heifer he ever saw. If she was, why did she not win first prize?

I bought a load of feed, and after dragging it three miles through the gumbo I was informed that I must buy my feed from a firm that had bought the concession. This firm had doubled the price of feed and straw. A foreign exhibitor stole my clipping machine, curry-comb, brush and twenty-two halters. I had him located all right, but the management told me it was too small a matter to bother about. I made a county exhibit and over 200 private exhibits. My son made an exhibit in the boy's department. My son was ruled out, and my private exhibits were all ruled out because, as the farm advisor superintendent of agriculture, who had never seen a two-row corn cultivator until he came to the county in which the fair was held, decided that he had never seen anything of the kind in the Ozarks and he would not allow one man to make so many en-

tries. The fact is: The superintendent had a lot of exhibits that he was making for a few special friends.

I am not a "hoss" man and know nothing about that department, *but the superintendent of the swine department was a hummer. There is a number of forged pedigrees of hogs in the secretary's office to his credit,* and swine breeders were disgusted. Why place such a man in such a position? I did not show at said fair this year.

ROBERT I. YOUNG."

The petition then alleged that a fair was held in St. Joseph in September, 1913, and another in August, 1914, and that in both years plaintiff was "Superintendent of the Swine Department" and that said fact was well known to the public, the patrons of said fair, plaintiff's friends and neighbors, and to breeders generally throughout the territory tributary to St. Joseph.

The petition alleged that defendant, by means of said false and libelous article and publication, intended to charge, and did charge: That plaintiff "by false pretense, to-wit, by means of false, forged and untrue pedigrees in writing did obtain the registration of certain swine in The Herd Register of the Standard Poland-China Record Association at its office at Maryville, Missouri;" that "the plaintiff did knowingly, in writing, give a false pedigree of swine;" that "the plaintiff had knowingly and wilfully, falsely and fraudulently signed some name other than his own to pedigrees of swine, and filed same in the office of the secretary of the Standard Poland-China Record Association at Maryville, Missouri;" and that said defendants, by said false and libelous matter, "intended to charge and did charge the plaintiff with having committed the crime of obtaining from the said Standard Poland-China Record Association, the registration of hogs by knowingly, and in writing, making and filing false, forged and untrue pedigrees of such hogs."

A trial resulted in a verdict and judgment against both defendants for $1000 actual and $4000 punitive damages. Both have appealed.

The article does not refer to plaintiff by name. It will be observed that after speaking of the St. Joseph fair, it then takes up, at the beginning of the third paragraph, the consideration of some other fair not named nor identified in any way. It says, "I exhibited at *a* fair *last year*," and then goes on to relate the troubles and difficulties he had at *that* fair and says his and his son's exhibits were ruled out because a certain official had never seen a two-row corn cultivator until he came "*to the county in which the fair was held.*" Another reason given why his exhibits were ruled out at *that* fair was because the superintendent thereof "had a lot of exhibits he was making for a few special friends." And then comes the part complained of as libelous; and the article closes by saying, "I did not exhibit at *said* fair this year." Now, on the *face of the article,* what fair was it, where there was a superintendent of swine who had forged pedigrees? Taking the article as it reads on its face, it was *some unnamed* fair of last year at which the author exhibited, at which he had so much trouble, at which so many of his exhibits were improperly ruled out and at which he did not exhibit this year. This being so, the jury should have been required to find that the readers of said article *understood that it referred to plaintiff.* If they would not understand that plaintiff was the superintendent mentioned, then there was no libel *as to him.* For "the gravamen of an action for libel is not injury to the plaintiff's feelings, but damage to his reputation in the eyes of others. It is not sufficient, therefore, that the plaintiff should understand himself to be referred to in the article. It is necessary, to constitute libel, that others than the plaintiff should be in a position to understand that the plaintiff is the person referred to." [Duvivier v. French, 104 Fed. 278, 1. c. 280.] Neither is it enough to constitue libel, that the defendants knew of whom they were writing. Persons other than these must have reasonably understood that plaintiff was the man referred to. [Same case, p. 281.] It may be that the allegations of the petition and the proof that plaintiff was the "Superintendent of the

Swine Department'' of the St. Joseph Fair in both years of 1913 and 1914, and that this was well known, would be sufficient of *enable the jury* to say that readers of the article would understand that plaintiff was the man. But they should have been allowed to so find and should have so found before returning a verdict in plaintiff's favor. Plaintiff's first instruction, however, covered the case and authorized a verdict without requiring the jury to find that the readers of the article so understood it. It reads:

"The court instructs the jury that it stands admitted in this case that the defendants made the publication set out in the plaintiff's petition of and concerning the plaintiff. Therefore, the court instructs the jury that if they find and believe from the evidence that the publication complained of is false and libelous they should return a verdict for the plaintiff; and the jury are further instructed that in determining the amount of actual damages sustained by the plaintiff, if any, you will take into consideration such injury, if any, as was naturally and probably done to the plaintiff's reputation, and to his business and character, and such damages as he may have suffered because of mental anguish, shame and humiliation, if any, you believe he has suffered by reason of such publication."

It cannot be said that the article *conclusively* shows on its face *what* fair it is dealing with, at which there was a Superintendent of swine who had forged pedigrees. It was for the jury to say what fair the *readers of the article* would understand was meant. Where the article is ambiguous, either as to its meaning or as to the person to whom it applies, there must be some proof that third persons understood its actual meaning and also understood to whom the words applied. [25 Cyc. 362, 452, 453; Wisner v. Nichols, 143 N. W. 1020, 1025; DeWitt v. Wright, 57 Cal. 576.]

As stated, there was no proof that the readers understood that plaintiff was charged with the forgery alleged. We do not understand that because plaintiff said his attention was called to the article, this supplied

that proof but, if it did, the jury should still be allowed and required to pass on the matter.

Nor did the defendants, either by their respective answers or in the course of trial or by their proof, concede that the readers of said article would understand it as applying to plaintiff. These things had no reference whatever to the *construction* the *readers* would put on the article or *their understanding* as to whom was meant. Consequently, we are of the opinion that instruction No. 1 for plaintiff was erroneous. And for the same reason instruction No. 8 was also erroneous. It reads:

"The jury are instructed that the defendant in this case, under the evidence, are making but one defense and there is only one point at issue between the plaintiff and the defendants, and that is whether or not the publication complained of and shown in evidence was, so far as it relates to this plaintiff, true or false; and the jury are instructed that the burden of proof in this case upon that issue, as to whether or not said publicaton was true or false, is upon the defendants to show to the reasonable satisfaction of the jury and by a preponderance of the evidence that said publication with reference to this plaintiff was true and if the defendants have failed to prove to the satisfaction of the jury and by a preponderance of the testimony that said publication, as it referred to the plaintiff, was true, then your verdict must be for the plaintiff."

There was more than "one point" at issue, or, at any rate, more than one thing was required to be found by the jury before plaintiff could recover. Whether the charge in the article was true or false was one and whether any third person understood it to refer to plaintiff was another, if indeed there were not still others.

These are errors which call for a reversal and a remanding of the case.

Inasmuch as the case is to be retried we must notice some other points raised by defendants.

In view of the answers of both defendants that they published the words complained of as libelous, and

alleged that they were substantially true, and attempted to establish their truth by offering evidence tending to show that plaintiff did file a false pedigree of swine in the office of the Secretary of the Association at Maryville and did thereby obtain the registration of a false pedigree as charged in plaintiff's *innuendo,* we do not think plaintiff's instruction was erroneous because it failed to require the jury to specifically find according to the *innuendo.* Section 4589, Revised Statutes 1909, makes it a misdemeanor to obtain a false pedigree by such means. And the inevitable and necessary conclusion to be drawn from defendant's answers and evidence is that if such evidence was true, the plaintiff was guilty within the meaning of the words charged and of the *innuendo* laid. There was, therefore, no dispute as to the *meaning of the words* but only whether they were true. If they were false, then they were libelous *per se,* hence all that the jury had to do, as to *this particular* feature of the matter, was to say whether they were false or not. There being no issue as to the sense or meaning in which the words were used, the jury were not required to find whether they had the meaning given them by the *innuendo,* and hence the instruction was not erroneous in this regard.

Properly speaking, the instruction should have explicitly told the jury the precise statement in the article that was claimed to be false and, if false, libelous; and should not have referred to them in such general terms as "the publication complained of." Of course, in determining whether the alleged false statement was a libel, the jury could take the entire article into consideration, but, as the instruction is now drawn, the jury might think that if any part of the article was false, the same was libelous although the part they thought was false might not be the particular part declared on as libelous. While the part in relation to false pedigrees was the portion declared on in the petition as libelous, yet the entire article was set out; and, of course, by referring to the pleadings and analyzing them with the trained ability of a legal mind, one would

know what particular words were referred to in the instruction, but the jury should not be required to refer to the pleadings to ascertain what the precise statement was that they must find to be false in order to find libel. Even if defendant Young's instruction No. 3 stated specifically the precise words which the jury were to say were true or false, which may perhaps have prevented the jury from being misled, yet plaintiff's instruction is complete in itself and directs a verdict without requiring the jury to find the facts upon which the case was based. To avoid any misunderstanding of the effect of the two instructions, the plaintiff's instruction should clearly set forth just what the jury were asked to decide, was false or true. In this way the issue would be set before them sharp, clear and distinct, and with no danger of mistake.

It is conceded there was no actual malice on the part of the newspaper. There was evidence also tending to show actual malice on the part of Young. He had had controversies and litigation with plaintiff before. The two defendants were sued jointly. Plaintiff asked and the court gave the following instructions on malice and damages:

"5. The jury are instructed that in law there are two kinds of malice—malice in fact and malice in law. By malice in fact is meant actual spite and ill-will toward a person; by malice in law is meant the intentional doing of a wrongful act without legal justification or excuse.    ,

You are further instructed that if you believe that the publication herein complained of was libelous and false you may infer that it was maliciously done.

You are further instructed that if you believe and find from the evidence that the publication herein complained of was maliciously made, as defined in these instructions, then in addition to the actual damages you may believe the plaintiff to have suffered, you may allow such exemplary or punitive damages as under all the circumstances you think the defendants ought to be punished."

"10. The jury are instructed that in law there are two kinds of damages, actual damages and punitive damages. Punitive damages are entirely within the discretion of the jury and are allowed in those cases where the wrongful acts of the defendant have been characterized by willfulness, maliciousness and ill will and such damages are for the purpose of punishing the defendant for the willful and malicious acts, and cautioning the defendant against the repetition of such acts.

You are therefore instructed that if you believe and find from the evidence that the publication herein complained of was maliciously made, as defined in these instructions, then in addition to the actual damages you may believe the plaintiff to have suffered you may in your discretion allow such exemplary or punitive damages as under all the circumstances you think the defendants ought to be punished. "

"13. The jury are instructed that when a publication charges the person named in the publication with dishonest conduct with reference to his business the law presumes that the person so mentioned is damaged thereby, and it is not necessary for him to prove any damages whatever. If, therefore, the jury believe and find from the evidence that the publication shown in evidence is libelous and charges the plaintiff with dishonest conduct and that such charges have not been shown to be true, then the jury should find actual damages in favor of the plaintiff, and if the jury also find that the publication was malicious as defined in other instructions they may also award to the plaintiff punitive damages, as stated in other instructions."

The defendant newspaper prayed, but the court refused, the following:

"If you find from the evidence that as a matter of fact, The News Corporation, acting through its officers and agent who caused the article complained of to be published, was not actuated by any malice whatever, but made such publication in good faith, believing the same to be true, and that at the time said officers and

agents so making said publication, had good grounds to believe and did believe said article to be true, and in the exercise of care on their part, would not have otherwise believed, then you cannot find any punitive damages against said defendant, The News Corporation.''

''If you find from the evidence that as a matter of fact, The News Corporation, acting through its officers and agents who caused the article complained of to be published, was not actuated by any malice, whatever, but made such publication in good faith, believing the same to be true, and that at the time, said officers and agents so making said publication, had good grounds to believe and did believe said article to be true, and in the exercise of care on their part, would not have otherwise believed, then you cannot find any punitive damages against either of the defendants.''

These two instructions were properly refused. Under the conceded facts in the case there was malice in law in publishing the article if it was false. The two instructions told the jury that, under certain circumstances, they could not find any punitive damages against the paper. The circumstances detailed in the instruction were not sufficient to eliminate malice in law, and yet the jury were told that if they found such facts, they could not find punitive damages. If the jury found the statement in the article was false then it was within the discretion of the jury whether they would give punitive damages or not, and they could not properly be told they must not. For whatever may be the rule in other jurisdictions the rule in Missouri is that the jury may award puntive damages based merely on malice implied by law. They are not required to find actual or express malice before they can award punitive damages. [Callahan v. St. Louis Transit Co., 122 Mo. 355; Arnold v. Sayings Co., 76 Mo. App. 158; Ickenroth v. St. Louis Transit Co., 102 Mo. 597; 18 Am. & Eng. Ency. of Law (2 Ed.), 1093.]

With reference to plaintiff's instructons above set forth, it seems to us that instruction No. 10 was *an invitation* to the jury to consider the actual malice on

the part of *one* of the defendants in fixing the amount of the punitive damage it would assess against *both,* without regard to whether the other defendant was guilty of actual or implied malice. No doubt the jury could assess punitive damages against both where one was guilty of actual and the other of implied malice only. But an assessment, if any, of punitive damages must be in one amount and against both defendants. There can be but one judgment and cannot be a heavier assessment against one than against the other. The jury, therefore, cannot assess punitive damages in any larger sum than the amount which, in reason, they think should be laid upon the defendant that is least culpable and, for that reason should be punished least. It is true, the jury *may* award punitive damages to the same extent against both, where one is guilty of actual malice and the other of implied malice only, but we all know the natural tendency is to give a larger amount of punitive damages for actual malice than where malice is only implied by law. Now instruction No. 10, in defining punitive damages, says they are allowed in cases where the wrongful acts of the defend*ant* have been characterized by *ill will,* and that such damages are for the purpose of punishment and to caution the defend*ant* against repeating such acts. The instruction then says that if the publication was made with the malice defined, then punitive damages may be given in such sum as the jury thinks the defend*ants* ought to be punished. Punitive damages are allowed in libel suits whether the malice be actual or merely legal. The different kinds of malice had already been defined in instruction No. 5 and the jury were told that if they found malice—i. e., malice of any kind—they could allow punitive damages. In the latter halves of the three instructions 5, 10 and 13, the jury were told over and over again that they could allow punitive damages. There is no need, in this State, of the existence of actual malice in order to justify punitive damages. Hence there was no necessity for instruction No. 10 to

refer again to actual malice and in that connection to tell the jury punitive damages were to caution the defendant against the repetition of such and that they could allow such punitive damages as they thought the defendants ought to be punished. Such ringing of the changes on punitive damages and actual malice could not fail to have a prejudicial effect and create in the minds of the jury that they should measure the punitive damages according to the actual malice of one defendant rather than according to the legal malice of the other. We do not wish to be understood as meaning to say that the jury could not do this if they saw fit. No doubt they can and under some circumstances they should, but what we are saying is that they should not be given an instruction to do so by repeated instructions on punitive damages. By having so many instructions on them and by laying an unnecessary stress upon actual malice in No. 10, the jury were, impliedly at least, invited to assess the amount of punitive damages with reference to the actual malice of one defendant rather than the legal malice of the other, who might otherwise be deemed worthy of less punishment.

The evidence as to the paper's owner telling plaintiff if he wanted any statement or explanation of the matter printed, they would be glad to print it for him, was properly excluded. This was after suit was brought and, therefore, could not be considered in mitigation even if it were an offer of retraction. [Evening News v. Tyron, 42 Mich. 549; Dinkelspiel v. New York Evening Journal, 85 N. Y. Supp. 570.] As the matter appears in the record, however, it is not even an offer of retraction.

The notations appearing on the defendant Young's private Hog Register as to what he did with certain pigs noted to have been farrowed by two sows therein and as to what became of other pigs of said sows, were properly excluded. Defendant testified of his knowledge to the facts shown by these notations. They did not refer to any fact relating to pedigree of which the

book was a record. The only purpose of the notations was to corroborate defendant Young's statement that he had let plaintiff have the pigs of one pedigreed sow to raise and that (according to defendant Young) plaintiff had, in the pedigree supplied to the Association Herd Register, registered these pigs as the pigs of a different sow. These notations on the register were, so far as anything on the face of the book itself concerned, such as could have been placed there at any time. There was nothing on the face of the book itself, or in the way it was kept, to show that they must have been made before and not after a controversy had arisen. And a controversy between the two men over the genuineness of the pedigrees of these pigs registered by plaintiff, had existed for a long time prior to the occurrence on which this litigation is based. The notations then were of no higher authority or greater force than Young's personal testimony which he could and did give. They were properly excluded.

This covers the question which, thus far, appear likely to occur upon a retrial of the case. For the reason hereinabove given the judgment is reversed and the cause remanded. All concur.