WILLIAM PEPPAS, RESPONDENT, v. H. EHRLICH & SONS MANUFACTURING CO., APPELLANT.—71 S. W. (2d) 821.

Kansas City Court of Appeals. April 30, 1934.

*Randolph & Randolph.* for respondent.

*Landis & Landis* for appellant.

TRIMBLE, J.—Plaintiff's petition alleges that on or about the ——— day of November, 1930, he bought of defendant certain restaurant fixtures to be installed in the "Manhattan Cafe" in St. Joseph, which was done; that the price of said fixtures so installed was $3600 which was secured by a chattel mortgage thereon for that sum; that on the ——— day of July, 1931, he paid $845 on said purchase price and thereafter became delinquent in the payments due on the balance of said indebtedness; that plaintiff, on account of bad

business conditions, asked for an extension of time in which to make his further payments on said indebtedness, whereupon it was orally agreed between them that—.

"If plaintiff would help the defendant find a buyer for said restaurant and would not remove from said restaurant certain other fixtures installed in said restaurant by plaintiff and not furnished by defendant, and which fixtures plaintiff had paid for and claimed the right to remove, which fixtures were of the value of One Hundred Sixty Dollars ($160) and consisted principally of plumbing fixtures, *the defendant would, if plaintiff would aid and assist him in selling said restaurant as aforesaid, pay back to the plaintiff all the money he had paid on said fixtures and what money he paid out on the above described plumbing fixtures."* (Italics ours.)

The petition further alleged that, relying upon said agreement and promise, plaintiff did refrain from removing said fixtures, and, at his own expense and by his own efforts, did find a purchaser for said restaurant, as a result of which defendant sold the said fixtures to the purchaser so found by plaintiff, for $3600, and put the purchaser in possession without foreclosing said chattel mortgage securing plaintiff's original debt for same; that defendant, in violation of his agreement, did not repay to plaintiff the said $845 he had paid nor the $160 "paid by him on said fixtures as aforesaid;" that by reason of all which he (plaintiff) has been damaged in the aggregate sum of $1005, for which he asked judgment and costs.

Defendant's answer was a general denial coupled with allegations setting up that plaintiff for the purchase price of the fixtures he purchased of defendant, executed the chattel mortgage "covering all of the fixtures by plaintiff from this defendant;" that default was made in the payment of said notes so that by the terms thereof all of them became due, and, in accordance with the terms of the chattel mortgage, plaintiff surrendered and turned over to defendant all of the property secured by said chattel mortgage, and, in compliance with the terms thereof, defendant sold the property covered thereby. No reply denying the answer appears in the record, but the case was tried as if there were one filed.

The trial resulted in the returning of a verdict, signed by nine jurors, for plaintiff in the sum of $500. From a judgment thereon, defendant has appealed.

The fixtures and equipment sold by defendant to plaintiff were bought under a written contract specifying $3600 as the purchase price, $300 of which was to be paid when contract is signed (and plaintiff testified he paid said $300 at that time). Said contract contained the following, among other provisions:

"The title and rights of possession of the above named articles shall be and remain in the said H. Ehrlich & Sons Manufacturing Com-

pany until the purchase money has been fully paid and it shall have the right at all times to remove same if the purchaser should fail to make payments thereon when due, and to retain possession of said goods and all payments made thereon as liquidated damages for breach of contract by purchaser.''

''The failure of the purchaser to carry out and perform any requirements herein on his part shall cause the indebtedness to become immediately due and payable.''

Plaintiff is a Greek, and his ways of expression are sometimes difficult to understand, but, as we gather from the record, he testified that in addition to the $300 paid at the signing of the contract, he bought an ice-box or refrigerator from plaintiff and paid $467.71 therefor, and he also bought and paid for certain ''plumbing things'' and connections, amounting to the sum of $160.

Plaintiff's evidence is that he paid an aggregate sum of $845 on notes (secured by chattel mortgage to plaintiff) given for the fixtures, which, with the $160 paid for the plumbing things necessary to connect them, aggregated $1005 for which he sues.

The purchase made of defendant, and for which the chattel mortgage was given, was in November, 1930. Plaintiff's testimony is that after paying the above named $845 on the mortgage notes (being for $100 each due on the 11th of each month for 30 consecutive months, with provisions that if default was made in the payment of any one when due, then all unpaid should become due) ; he, some days prior to July 11, 1931, saw Mr. Ehrlich of the defendant company and told him business was ''quiet'' and he (plaintiff) was not able to pay more at this time on his debt; that Mr. Ehrlich, speaking for and representing the defendant company, said : ''Well, I think it best for us to look after to find somebody to sell this to. Can't you get some Greek to sell it to?'' ''And I say 'I know a couple of Greeks to buy it but it takes a little time.' He said 'Go ahead and if you get those boys to buy this place here *I turn back what you pay for the fixtures on this place here but don't touch nothing here.* Don't take anything out or let anybody take anything out. Tell them the place is for sale.' '' . . . ''I had come to the point where I was going to close up and take out what I had in the restaurant. Those plumbing things and plumbing fixtures. I talked to Mr. Ehrlich about taking that out. He said 'Don't touch anything at all.' He said 'You want to get the customer to buy this place. Tell him to come to see me and when I close the deal I pay you what you put in.' He said, 'Go ahead, rush, rush, rushing them to close the deal, and you not be out. You get your money, what you put in so we don't have to take it. If we take the stuff out it isn't worth nothing to us.' After I talked to Tranos, I went to Kansas City. I saw Alex Koutsoubos. Then Alex came to St. Joseph. I made about five trips to Kansas City in

connection with this matter at my own expense. I didn't close the deal with Tranos and Koutsoubos I told him to go to Mr. Ehrlich to close the deal. I didn't have a thing to close. He had the mortgage. Mr. Ehrlich instructed me any time I got any of the Greek boys to buy the restaurant, not to mix it up at all with these boys but to tell them to come and see him because he had everything in his hands and would take care of me. I sent these boys to Mr. Ehrlich. Mr. Ehrlich sold it to them.''

Later, plaintiff testified he never bought a refrigerator from Mr. Ehrlich, but did buy from him *an ice-box*. He admitted his name was on the contract (Exhibit B) with plaintiff for what he calls an icebox, but the contract calls at ''1—No. 250 Short Order Restaurant Refrigerator,'' the price of which is $312 instead of $467.71 to which he testified as heretofore stated. On the back of said contract (Exhibit B), appears the same provision as to title and rights of possession remaining in defendant until debt is paid, as in the contract hereinbefore shown.

The record further discloses that plaintiff gave a $3300 chattel mortgage to defendant, not only for the fixtures and equipment but also a chattel mortgage for $287 consisting of promissory notes of $20 each and one for $27 on the No. 250 Short Order Refrigerator. Both of these chattel mortgages provide that in case of default of the secured notes, or if at any time mortgagee should feel unsafe or insecure, then ''it shall be lawful for the said mortgagee, their assigns, or their agent, to take immediate possession of said goods and chattels wherever found, the possession of these presents being sufficient authority therefor and to sell the same at public or private sale, or as much thereof as shall be sufficient to pay the amount due or to become due, as the case may be, with all reasonable costs pertaining to the taking, keeping, advertising and selling of said property, including a reasonable attorney's fee for making said sale of not less than ten per cent of the debt, the money remaining after paying said sums, if any, to be paid on demand to said party of the First Part.''

On cross-examination, plaintiff stated that his landlord did not tell him to get out, he left of his own accord though he says a suit for possession was brought against him July 11th and he stayed until July 19th. He gave up the key about the 22nd of July. He further said:

''Nothing was said by Mr. Ehrlich as to the price that he was to get or the amount the purchaser was to pay. It didn't make any difference whether Mr. Ehrlich sold for $1500, or $2000, or $5000, he offered to pay me back all I had paid in. I am positive of that. I told him I would find a buyer to buy the place and he agreed with me to pay my money back what I paid him. He don't tell me what

he was to sell for. There wasn't anything said about the price Mr. Ehrlich was to get on a resale. Of that I am positive. I have never in any way indicated that the price at which Mr. Ehrlich was to receive was mentioned. My deposition was taken in Mr. Landis' office. Mr. Randolph was present. I got the deposition and read it over. Mr. Randolph was there and sat beside me while I read it. Then I signed it and swore to it.''

But he later admitted that in his deposition he had said:

''Mr. Ehrlich he says, 'If you close the business and if you compel me to take the stuff out of there I am losing a lot of business but if you find a buyer to buy the place we will see you get your money which you put in with us *if we sell the property same price we sell it to you.*' '' (Italics ours.) . . . and that ''if these people buy the place the way he sold it to me then he says, 'We pay you whatever you pay us because we like to see you get a square deal,' and I say 'That is fine.' '' . . . and that he, plaintiff, said to Mr. Ehrlich, 'These boys want to buy me out,' and I, And he says, 'You go ahead, make the deal and don't worry; you will get your money what you put in with us if we sell them at the price we sell to you.' ''

There is no need of considering defendant's demurrer to the evidence offered at the close of plaintiff's case and which was overruled, since that demurrer was waived by defendant's failure to stand thereon and its action in going on with its evidence. As to the demurrer at the close of all the evidence, it is clear that there is enough evidence to make an issue, not only as to the promise of defendant to repay plaintiff what he had paid defendant, but also as to the true amount he, plaintiff, had paid.

Of course it is true that Ehrlich denied he had made any such promise and there is a dispute over the amount plaintiff had paid on what he owed for the things bought of defendant; also a dispute as to who had secured a purchaser of the restaurant after plaintiff found he was unable to pay and would have to give up the restaurant, plaintiff claiming that he after much effort and expense found them, and Ehrlich insisting that he did.

There was certainly no error in overruling defendant's demurrer to the evidence.

It is contended by defendant that the verdict in plaintiff's favor for $500 is not responsive to the issues. This on the theory that since plaintiff claimed he had paid $1005 and sued on an express contract, the jury had to find for that amount or else find for defendant. We do not so understand it. Plaintiff sued on an oral contract that if plaintiff would not remove things from the restaurant or place of business but leave the restaurant equipped as it was so it could be sold as such, and would find a purchaser who would pay as *much* as defendant had sold the fixtures and equipment to plaintiff (the

title to and possession of which, under all the evidence, was, after the default, in defendant) the latter would repay to plaintiff *whatever amount* plaintiff had paid. Plaintiff *alleged* that amount was $1005, but that did not bind the jury to a verdict for that amount. As a matter of fact, plaintiff's evidence tended to show he had paid $1080, but no amendment of the petition was made to include that amount, while on the contrary, the defendant's evidence contradicted that of plaintiff as to the amount paid; and, as to a *part* of the sum plaintiff claimed he had paid, his own evidence has some marks of uncertainty and doubt, so that the jury could well find that the *true* amount he had paid defendant on its debt was only $500. In this situation, cases like Cole v. Armour, 154 Mo. 333, and other cases cited by appellant on this point are not deemed to be applicable.

The point that there is no consideration for the alleged promise sued on, cannot be relied on, for more than one reason. (1) Lack of consideration was not pleaded. (2) Even if the contention in regard to consideration be considered an entire *want* of consideration at the outset, or a mere *failure* of consideration, nevertheless, appellant's point is unavailable here since the evidence discloses that plainitff had some articles not purchased from defendant nor covered by its mortgages, which plaintiff had an undoubted right to remove, and if he left these in the restaurant because of defendant's promise, this would furnish a consideration as would also the expense plaintiff went to in the effort to find a purchaser for said restaurant and the articles on which defendant held its mortgages, to say nothing of what defendant saved by having one to purchase the property that had been mortgaged to defendant, as it then stood installed in the restaurant, instead of having to remove same and sell it unconnected with any equipped restaurant. There was ample consideration. [13 C. J. 315, 318.] Again, the case was tried without suggestion of any kind that there was any want or failure of consideration for the alleged contract to repay plaintiff what he had paid. Consequently we would not be justified in reversing the case on such ground.

It is claimed that error was committed in refusing to allow witness Siemens, in charge of the defendant's account books, who, after reading from the ledger certain credits aggregating $300, to testify whether those credits constituted the payment of the $300 plaintiff was to pay at or before the contract was signed, or otherwise. It would seem that since he testified that all moneys came into the hands of the cashier, and his (witness') duty was in "supervising" the books, that the cashier and not this witness was competent to testify what the credits were for on the books from which the credits were read, especially as the items on the books did not state on their face what they were for. But, however this may be, the evidence is clear that the price of the articles first purchased was $3600. The chattel

mortgage taken was for $3300 or, in other words, $300 less than the purchase price, consequently the difference must have been the $300 the plaintiff says he paid in cash when the stuff was bought or the contract for the purchase thereof was entered into. Moreover the witness Siemens was allowed later on to give without objection the facts constituting the evidence excluded as above mentioned. There was certainly no reversible error here.

The amount plaintiff had paid on the "plumbing fixtures" was clearly within the pleadings, as an examination of the quoted part of the petition, shown in the first part of this opinion, will disclose. The contract for them was introduced merely to show, in corroboration of plaintiff's statement, that he paid $160 therefor. This was the only purpose and possible effect the introduction of the contract in relation to the plumbing fixtures could have. To this extent it was not hearsay as to defendant. Hence no error in its introduction.

The contention that plaintiff's deposition, not repudiated at the trial, has the effect of barring his recovery has already, in effect, been answered. It did not destroy plaintiff's case, but, at most, merely went to the question what amount defendant had promised to repay.

The objection to the argument made by defendant's counsel concerning the matter of whether defendant foreclosed the chattel mortgage or not, is wholly without substance or merit. The chattel mortgage provided it could be sold at public or *private* sale; and whether the mortgage was technically foreclosed or not is immaterial under all the facts and circumstances. The plaintiff surrendered the mortgaged property to defendant and the plaintiff consented to defendant's resale thereof and, in fact, did all he could to bring it about, and indeed the basis or his present suit is that defendant did resell it and obtained as good a price as plaintiff had agreed to pay.

Other points made by appellant are equally untenable but we think we have reasonably covered all matters calling for solution. For instance, we are unable to see wherein the jury can be charged with passion and prejudice in the verdict they returned. The substance or real gist of this contention is merely that no verdict against defendant should have been returned at all. The judgment is affirmed. All concur.