NICHOLAS ADAMS v. OSCAR J. MOBERG, Administrator of the Estate of STEPHAN GERBRICH, Deceased, and JUSTINE PLESCH, Appellants. —No. 40198.—205 S. W. (2d) 553.

Division One, November 10, 1947.

*Claude W. McElwee* for appellants.

1176

*Abeken & Bergmann,* by *Roy H. Bergmann* for respondent.

 DALTON, C.—Action for specific performance of an oral contract concerning described real estate in the City of St. Louis. The trial court granted the relief prayed and defendants have appealed.

Plaintiff alleged that Stephan Gerbrich and Fannie Gerbrich, his wife, were the owners of a house and lot in the City of St. Louis, hereinafter referred to as the Oberbeck Street property; that, during the year 1928, they were desirous of purchasing the property now in controversy, hereinafter referred to as the Bittner Street property; that they would not purchase it except on a cash basis and needed $4500 in cash; that they knew plaintiff had approximately $2800 in a savings account and, prior to their purchase of said property, they entered into an oral contract with plaintiff whereby they agreed to convey and did convey to plaintiff the Oberbeck Street property and he agreed to execute a deed of trust thereon to the Baden Bank of St. Louis, obtain a loan in the sum of $1800 and pay the said sum over to Stephan and Fannie Gerbrich, together with $2700, which plaintiff had in said bank; and that "it was promised and agreed by said Stephan and Fannie Gerbrich that in the event plaintiff would perform the conditions aforesaid and pay over to them the said sum of $4500, that plaintiff *would receive* the Bittner Street property upon the death of Stephan and Fannie Gerbrich or the survivor of them." (Italics ours.) Plaintiff alleged that he fully performed all the conditions of the contract which were to be performed by him; that said Stephan and Fannie Gerbrich acquired the Bittner Street property; that Fannie Gerbrich died in November 1936, and Stephan Gerbrich died in April 1945; that plaintiff became and was entitled to receive the said property upon the death of said Stephan Gerberich; and that Stephan Gerbrich did not perform said contract, but left a will, duly admitted to probate, by which he made a contingent cash provision for his daughter, Marie, and gave all the remainder of his estate to his niece, Justine Plesch.

Stephan Gerbrich and Fannie, his wife, came to St. Louis from Roumania. No children were born of the marriage, but Stephan Gerberich had a daughter, Marie, by a prior marriage. The Gerbrichs owned the Oberbeck Street property and resided there at the time plaintiff and his sister, Rose, emigrated from Roumania and came to live with them. Plaintiff and his sister were employed outside of the home and always paid board, although they were related to Mrs. Gerbrich. The Gerbrichs acquired the Bittner Street property (sometimes referred to in the testimony as the bungalow or 833 Bittner),

for close to $8000, from Dora Schneidhorst by a deed dated September 29, 1928. By a deed of the same date, the Gerberichs conveyed the Oberbeck Street property to plaintiff, and plaintiff executed a deed of trust thereon to H. J. Fisher, trustee for W. M. H. Kruse, to secure a note for $1800. All deeds were recorded October 2, 1928. The loan for $1800 was made by the Baden Bank to plaintiff and final payment was evidenced by a check of plaintiff, dated October 4, 1944, drawn on the Baden Bank for $717.50. The Oberbeck Street property was worth $1700 to $1900 on September 29, 1928. In 1932, plaintiff made extensive repairs to the property and he still owned it at the time of the trial.

After the acquisition of the Bittner Street property, the Gerbrichs moved there with plaintiff and his sister. Later, in 1931, plaintiff's sister married and left, and in 1936 Mrs. Gerbrich died. Plaintiff and Mr. Gerbrich remained in the property until 1941, when plaintiff married and rented the property and Mr. Gerbrich moved to the home of his niece, Mrs. Justine Plesch, where he died in April, 1945. The will, as alleged, provided a contingent cash legacy for testator's daughter and left the remainder of his property to his niece, Justine Plesch. The estate consisted of two pieces of real estate and no personal property. Claims filed and allowed amounted to only $100.

Rose Weckemann, a sister of plaintiff, testified that prior to the purchase of the Bittner Street property, Mr. Gerbrich had a conversation with her and her brother, when Mrs. Gerbrich was present, as follows: "He says, 'we want to buy that house,' but they haven't got enough money, so, he asked me if I would loan him the ▇▇▇ money I got saved and my brother should give him 4500, because they needed that much, because I only had 1500 saved at that time in '28 and my brother only had 2700 saved and he says, 'How can I give you 45, if I only got 27,' So they says well, he should make that loan of 1800 and then he could give him the money and then he got the house and after their death, then he would get that bungalow, 833 Bittner, if he would give him 4500. Q. Your uncle said that to him? A. Uncle said that, if they make the deal, when they went over to the bank, he had to make the $1800.00 loan, and he says, if he give him that $4500.00, then he will get the bungalow after his death and my aunt's death." She further testified: "Then they came home and they told me that my brother had signed the loan for 1800 to give him the 4500 for the house and they said that after their death—both of their death, 'Nick is going to get the bungalow.' . . . This was said by Stephan Gerbrich and Fannie Gerbrich. . . . Q. Did Uncle make any statement later on? A. Well, he said after my aunt died, he says, 'Nick lives with me, and Nick is there, he gave me the 4500 for the house' and he says, 'He will get the house after his death.' Q. Now did they take your $1500.00? A. Yes, they took mine, but they paid it back without interest, be-

cause I said I didn't want any." Witness got her money when she got married in 1931. Plaintiff was not paid back. The witness said, "No, they never did pay him back, . . . my brother never did get any money back. . . . Well, my uncle and aunt told me that they didn't have the money . . . they say after their death he gets the house, because my uncle was old and he didn't work steady and just done odd jobs and so they didn't have the money, because if they would have had the money, they wouldn't ask us for the money, or, my brother for 4500. Q. (By the Court) Could it ever have been paid back without your knowing about it? A. No, sir. Q. Why not? A. Well, uncle always told me they didn't pay him back, 'So, he will get the house' after he is dead." The witness further quoted Mr. Gerbrich, as follows: "He says, 'Nick is going to get the house, because we got the money from him, he gives that $4500.00 and he will get the house; and he said, 'Well, you will get something, too,' but he never did, neither did I mind what I will get, but he always says, 'I will never forget you,' and he always said my brother will have that house, 'Because he gave me the money to buy that house and he had his money in there.' " When the Gerbrichs talked of buying the Bittner Street property, "they didn't want to be obligated on any loans" and the reason they wanted plaintiff to sign the deed of trust on the Oberbeck Street property was "so, that if it wasn't paid, they wouldn't be liable for it."

Rose Wachsler testified that she visited the Gerbrichs frequently while they lived on Oberbeck Street. They talked in German. She had known Mr. Gerbrich in Roumania. Two or three weeks after the Bittner Street property was acquired, the Gerbrichs visited her home, and said: " . . .. We deed that house on Oberbeck to Nick and made him take a loan, so we shouldn't have any debts and Rose can use her money and we bought it this way and we are going to live over there . . . We promised Nick that the house is his when we die, when he helps us that way. . . . Well, the translation would be he promised Nick that house when he die if he helps us to buy that and takes that deed—the deed to this house on Oberbeck Avenue to us so we haven't got any debts. . . . Mr. Gerbrich repeated to me several times even after Mrs. Gerbrich died. . . . He says, 'Nick gets that house in return when we die; he does everything for his ownself . . . We promise him that house when we die.' " Mr. and Mrs. Gerbrich further told her " "We paid Rose back and we deed that house on Oberbeck to Nick' and they had to take the mortgage and carry the interest and so they should keep those things and then the house was Nick's, because Rose is paid back."

Louis E. Hellman visited at the Gerbrich home on Bittner Street and asked Mr. Gerbrich what he was going to do with all of his money when he passed on to the great beyond. He testified: " 'Oh',

he said, 'That will all be taken care of'; he said, 'Nick knows he is going to get this house, because ▮▮ my wife and I both promised him that, . . . if it had not been for Nick we weren't even able to buy the house in the first place and Nick fully understood he was, to have the house when he passed on. . . . Nick understands fully that he is going to get this house when I pass on. . . . He has done so much for us that we just couldn't see any other way than to give him the house when we pass on, because the fact of the matter is, he has got more in this house than I have.' . . . Well, he said at the time he bought it he didn't have sufficient cash to swing the deal and Nick had some cash and he induced Nick to draw the money out of the bank so he would have sufficient money to pay it all in cash.''

Jacob Kowats had known Mr. Gerbrich about 40 years. They had been good friends and visited in each other's homes. He recalled when the Bittner Street property was purchased. He testified: "He tell me he intend to buy the house, the bungalow and he tell me all the things what they got on their mind. . . . My wife and we look at the place and I said, 'It is a nice place, but a little too much money.' . . . I can't tell you though how much—how much he paid for it. . . . It was over $7000.00, I know that, . . . Well, Stephan say, 'Nick going to borrow us money so we can buy that house. We going to take over the whole house here and he get cash money quick and we take money out of the house and go take the money that we can pay cash money and he said it belongs to him and he going to get that house when we die. . . . Nick would get the house, because he help us out.''

Concerning where Mr. Gerbrich got the money, the witness said: "He had some money—I don't know, over $2000,00 cash and Nick had some money and Nick take the house over, that old house, and borrow some money on that old house that he pay cash out. . . . I hear after more than three dozen times already. He says, 'That one I turn that over to my niece already, that single flat, and that bungalow it is still in my name,' he says, 'So what I am staying here, it is my house yet and I am going to turn that over to Nick; I promise to him and he is going to get it.' . . . Well, Gerbrich tell me that Nick is going to take the old house over . . . Make it good and he get some cash money and 'We got some cash money and he going to borrow very much money what we need more from the bank that we can pay cash for the house and after we die, it belongs to Nick—we promise him he is going to get it then.' . . . He say, 'They give us the money here so much that we buy the house and it is going to be his house.' He said he going to give us the money which Nick—Nick going to take over this old property. He

take and borrow it on the old property and they got enough money together to pay cash for that new bungalow.''

Charles S. Schaum knew plaintiff and Stephan Gerbrich and visited them while they resided in the Bittner Street property. He testified with reference to Mr. Gerbrich, as follows: "Well, I used to kid him all the time about money and stuff and he says, 'Oh, I ain't got anything, just this house here,' and he says, 'When I bought the house, Nick helped me out with the money' and he said, 'It was the understanding that Nick would get the house when I die.' '' Another time Mr. Gerbrich said: "Nick takes care of everything for me—takes care of the house and everything; well, he should do it, anyway,' he says, 'He is going to get it anyway when I die, so, it is up to him to take care of it, anyhow.' ''

Plaintiff's wife testified that she married plaintiff in April, 1941. She had known Mr. Gerbrich since 1930. Immediately before her marriage to plaintiff she went to the house to do some cleaning. Mr. Gerbrich said to her: "Well, I see you clean it and take care of it, that is the way it is going to be,' he says, "because Nick is going to get the house, I promised it to him,' he says, 'when I bought the house.' ''

William H. Kruse, executive vice-president of the Baden Bank of St. Louis, testified that he had the custody of the records of the Baden Bank; and that the records which he had with him, including the savings account of Rose Adams (plaintiff's sister) for $1534.91, were the original records kept by the bank showing the accounts. On October 2, 1928, there was a withdrawal of $1500 from Rose Adams' account. On the same date the Nick Adams' account showed a balance of $2782.25 and then a credit of $1800 and a withdrawal of $4500. On the same date the account of Stephan Gerbrich received a credit of $6000 and the balance before the credit was $2240.31. On October 2, 1928, there was a withdrawal from the Stephan Gerbrich account of $36.00 and on October 4, 1928, a withdrawal of $8059.52. The withdrawal slips, not being kept after ten years, were not available. The original record sheets of the bank, "from which Mr. Kruse read these accounts," were offered and received in evidence, although there is some dispute as to the admission of one exhibit.

Defendants offered some testimony tending to show that on June 4, 1945, after Mr. Gerbrich's death the plaintiff paid one month's rent, "probably for . . . from sometime in May until June," to a real estate firm with whom the executor under the will was associated. There was evidence that Mr. Gerbrich told a tenant of the other property owned by him that his niece, Mrs. Plesch, was very good to him, and that, when he died, "everything belongs to her . . . and she is going to collect the rent after that." There

was evidence that he further said to a neighbor of Mrs. Plesch, "everything I have when I die goes to Mrs. Plesch."

Appellants assign error on the admission in evidence of the testimony of witness Kruse and the original records of the Baden Bank. Appellants contend (1) that "said bank records contained merely the bare entry of debits and credits, without any identity or evidence of what they covered, and without any connection of the entries with the payment of any money by plaintiff to Stephan Gerbrich"; (2) that "the payment or loan of money is not properly proven by a mere book entry"; and (3) that "there was no evidence offered to show either that Mr. Kruse made the entries in question in the ledger sheets, or that they were made under his direction, and . . . no evidence . . . that the person who made the entries, or the person under whose direction they were made, was unavailable . . ."

We need consider only the first contention, which alone is based on objections made when the evidence was offered. Kansas City v. Hannibal & St. J. R. Co., 77 Mo. 180, 185. At the trial appellants objected to Mr. Kruse's testimony concerning the several accounts on the ground that the evidence was "incompetent, irrelevant and immaterial"; that it "wouldn't tend to prove anything on this contract"; that it was highly speculative and conjectural whether the money withdrawn from the Rose Adams' account went into Stephan Gerbrich's account; and that there was no identification of the source of the deposits or the disposition of the withdrawals, nor of the connection with any other sum of money or account. The original records of the bank, showing the several accounts, were objected to because "they are not in any way shown to be connected with the transaction involved and in issue."

The testimony and exhibits were offered and received in evidence on the theory that the items of the several accounts tended to corroborate the oral testimony of the witnesses regarding the alleged transaction from which the cause of action arose. We need not consider the admissibility of the evidence independent of such oral testimony. The documentary evidence that, on October 2, 1928, Stephan Gerbrich had on deposit $2240.31, plaintiff $2782.25 and Rose Adams $1534.91, all tended to corroborate the oral testimony that the parties had the sums mentioned available for disposition. The deposit of $1800 in plaintiff's account on October 2nd, the withdrawal on the same date of $1500 from the account of Rose Adams and $4500 from plaintiff's account and the deposit of $6000 in Gerbrich's account also tended to corroborate the oral testimony of the witnesses. The same is true with reference to the withdrawal of $8059.52 from the Gerbrich account. While the several exhibits and their items of debit and credit, standing alone, did not show any connection with the transaction in question, the whole picture was shown by oral testi-

1184

mony and the documentary evidence tended to corroborate the oral testimony to the extent shown. The evidence was competent ▪ and admissible as corroborative evidence tending to show a reasonable probability that the facts were as stated by the witnesses. State v. McDowell, 214 Mo. 334, 341, 113 S. W. 1113; Lock v. Chi. B. & Q. R. Co., 281 Mo. 532, 219 S. W. 919, 922(8); McDonald v. K. C. Gas Co., 332 Mo. 356, 59 S. W. (2d) 37, 43; Luechtefeld. v. Marglous (Mo. App.), 151 S. W. (2d) 710, 714; Peppas v. H. Ehlrich & Sons Mfg.. Co., 228 Mo. App. 556, 71 S. W. (2d) 821, 825; Chambers v. Hines, 208 Mo. .App. 222, 233 S. W. 949,; 951; Elsworth Coal Co. v. Quade, 28 Mo. App. 421, 426; 70 C. J. 1180, Sec. 1368; 31 C. J. S., Evidence, Sec. 162, p. 827; 20 Am. Jur., Evidence, Secs. 251, and 1053; Annotation, 52 L. R. A. 689, 718. Compare, Winchell v. Gaskill, 354 Mo. 593, 601, 190 S. W. (2d) 266, 271, and Byrne v. News Corp., 195 Mo. App. 265, 190 S. W. 933, 938, where evidence valueless for the purpose of corroboration was held properly excluded.

▪ Appellants further contend that the oral contract, as pleaded, as silent as to the means whereby plaintiff "would receive" the Bittner Street property; that the words "would receive" are ambiguous and do not designate any positive act contracted to be performed by Mr. Gerbrich; that the contract is vague, indefinite and uncertain in its essential terms; and that a court of equity will not make a contract for the parties, nor grant specific enforcement of the one pleaded. Appellants cite Baldwin v. Corcoran, 320 Mo. 813, 7 S. W. (2d) 967 (where a contract for sale of land, with a deferred payment, did not state time for payment nor the terms of the obligation to evidence it); Hayworth v. Hayworth (Mo. Sup.), 236 S. W. 26 (where the description of the land was uncertain and the contract testified to was not the one pleaded). In the case of Sutton v. Hayden, 62 Mo. 101, 108, in an action in equity to have title to particular lands vested in plaintiff, the agreement pleaded was that if plaintiff, Mrs. Sutton, "would come and live with her (Mrs. Green) . . . and nurse and take care of her for the remainder of her (Mrs. Green's) life, . . . all that she had should be hers (Mrs. Sutton's) at her (Mrs. Green's) death." In granting the relief prayed, the court said: "Nor is it regarded as any substantial obstacle to the relief sought that the mode whereby the property was to be transferred was not specified. The intention to transfer the property was the chief. thing, the method by which the intended result was to be attained, was wholly immaterial." (62 Mo. 101, 113). The obligation of deceased as expressed in the contract was sufficiently clear, definite and certain, it did not need to be detailed. Sportsman v. Halstead, 347 Mo. 286, 147 S. W. (2d) 447, 452(2) ("should have and receive"); Smith v. Lore, .325 Mo. 282, 29 S. W. (2d) 91, 92 ("would give"); Sharkey v. McDermott, 91 Mo. 647, 654, 4

S. W. 107 (agreement to "leave" property); Signaigo v. Signaigo (Mo. Sup.), 205 S. W. 23, 29.

Appellants further contend that the decree is erroneous because "the trial court decreed the performance of terms and provisions which were not alleged or proven to be contained in the alleged verbal contract sued on." The decree vests the title to the Bittner Street propery "in the plaintiff, free and clear of any and all claims or debts of the estate of Stephan Gerbrich." Appellants insist that the court made a contract for the parties and then decreed its enforcement. The record shows that Stephan Gerbrich owned the Bittner Street property, free and clear of liens and encumbrances at the time of his death. The agreement, as alleged, providing for transfer with no exceptions, implied a clear title. Green v. Ditsch, 143 Mo. 1, 12, 44 S. W. 799; 55 Am. Jur., Vendor and Purchaser, Sec. 226, p. 684.

Appellants further contend that certain definite and well established rules governing the enforcement of oral contracts have not been met and satisfied. The rules referred to have been stated and considered in many cases. See, Feigenspan v. Pence, 350 Mo. 821, 168 S. W. (2d) 1074, 1078; Herman v. Madden, 349 Mo. 447, 162 S. W. (2d) 268, 269; Walker v. Bohannan, 243 Mo. 119, 135, 147 S. W. 1024, 1028; Forrister v. Sullivan, 231 Mo. 345, 375, 132 S. W. 722, 730. It is particularly argued (1) that the declarations attributed to Stephan Gerbrich were loose and casual and wholly insufficient to establish the alleged verbal contract and its performance beyond a reasonable doubt; (2) that the alleged contract was not fair and should not be enforced in equity; and (3) that, since the only consideration paid was money, the respondent may be compensated in money, if the contract was in fact made and breached, as alleged.

While the evidence can be only briefly reviewed in this opinion, we have carefully considered the whole record and find it clear, cogent and convincing. There was little or no dispute concerning the ultimate facts. Appellants stress the evidence concerning respondent's alleged payment of one month's rent after Stephan Gerbrich's death. If the payment was made, as stated, it was during the period of uncertainty as to what action should ultimately be taken. We do not consider it controlling. The trial chancellor saw and heard the witnesses in support of the alleged contract and believed their testimony. We defer to his findings.

Concerning the fairness of the contract, appellants insist that respondent obtained a loan for the full value of the Oberbeck Street property and, in paying it off, he only paid for the property, so that the only consideration paid was $2700 on property worth $8000. There was no evidence concerning the value of the Bittner Street property at any time, except as evidenced by the purchase price

in 1928 and the $30.00 per month rentals in 1941-1945. When the agreement was made, it was uncertain when respondent would receive the property. He was in fact out the use of his money from 1928 to 1945. In addition, respondent assumed an $1800 indebtedness, which he was able to discharge and retain the property securing it. The contract was considered beneficial to the Gerbrichs, who wanted no debts, liens or encumbrances against their property. Under the facts shown, we do not consider the contract unconscionable.

■ Was respondent entitled to specific enforcement? Appellants rely on Selle v. Selle, 337 Mo. 1234, 88 S. W. (2d) 877, 881; and Dieckmann v. Madden, 349 Mo. 312, 160 S. W. (2d) 724, 727; and insist respondent has an adequate remedy at law and can be compensated in money. The agreement involved the purchase of a particular tract of real estate in which respondent's funds were invested. Respondent was to have the property upon the death of the last surviving tenant by the entirety. Respondent assumed and discharged other obligations and fully performed the contract on his part. There is no satisfactory evidence concerning the value of the property or the amount of assets in the estate. The Gerbrichs had the full benefit of the contract, which they deemed beneficial, from 1928 until the death of the last survivor. On the record presented, it would be a manifest fraud upon respondent to deny him relief by way of specific enforcement in a court of equity.

The judgment is affirmed. *Bradley* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.