CHET A. PLATT, Administrator *Pendente Lite* of Estate of JOSEPH A. HUEGEL; LOUIS J. HUEGEL, CHARLES P. HUEGEL, LAWRENCE B. HUEGEL, HENRY O. HUEGEL, EUGENE W. HUEGEL, JOSEPHINE HUEGEL KIRKPATRICK and MARY ELINOR HUEGEL, by Her Next Friend LAWRENCE B. HUEGEL, v. MARY M. HUEGEL, Appellant. —32 S. W. (2d) 605.

Division One, November 18, 1930.

*Ira H. Lohman* and *Barnett & Hays* for appellant.

778

*Irwin & Bushman, Dumm & Cook* and *H. P. Lauf* for respondents.

GANTT, P. J.—Suit by the children of Joseph A. Huegel and the administrator of his estate against the defendant, his second wife, to recover 1246 shares of capital stock of the Central Hotel Company, a corporation. Huegel, the owner, transferred the stock to defendant.

The petition was in one count. Therein it was charged that the transfer was procured by the fraud and undue influence of defendant, and plaintiffs prayed for cancellation of the transfer. At the close of all the evidence, plaintiffs asked leave to amend the petition by adding another count in which they charged that the transfer to defendant was for a particular purpose; that said purpose failed; that she held said stock in trust for the use and benefit of Joseph A. Huegel, his personal representative and heirs-at-law, and prayed that defendant be declared a trustee, holding the stock for the benefit of the estate of her husband. The court permitted the amendment, and defendant filed general denials to both counts of the amended petition. Both before and after the amendment, the court made offers to defendant of further time to produce testimony and prepare for trial under the second count. The offers were declined. She does not assign error on the amendment. However, a statement

of the fact of amendment and when made may be necessary to an understanding of questions for consideration.

On submission the court found Mary M. Huegel to be the widow of Joseph A. Huegel; that Joseph A. Huegel during his lifetime was the owner of said stock of the value of $100,000; that the transfer of said stock by Huegel to the defendant was for the purpose of aiding the financing of extensions and additions to the hotel, which were never made; that the plans therefor were abandoned; that the purpose for which said stock was conveyed had failed; that 1245 shares of said stock were transferred to and are held by the defendant as trustee for the use and benefit of Joseph A. Huegel, and that the defendant is the owner of said stock in trust for the use and benefit of the estate of said Huegel.

After so finding, the court decreed that the transfer of said stock by Joseph A. Huegel to Mary M. Huegel was in trust for his use and benefit; that she now holds said stock in trust for the use and benefit of his estate; decreed cancellation of the transfer and vested the title to the stock in Chester A. Platt, Administrator *Pendente Lite* of the estate of Joseph A. Huegel. Defendant appealed.

The second count proceeds on the theory of an express trust of personal property and the failure of said trust from which a trust results. This is permissible, for a resulting trust may arise from the failure of an express trust. [Sanford v. Van Pelt, 314 Mo. 175, l. c. 203, 282 S. W. 1022; 26 R. C. L. p. 1216.] And "an express trust may be proved not only by express declarations but also by circumstances from which its existence may be inferred, and to this end evidence of the acts and declarations, either oral or written, of the parties, as well as the surrounding circumstances, may be admitted and considered." [39 Cyc. 80; Faulds v. Dillon (Mich.), 204 N. W. 733, 735; Williamson v. Yager, 34 Am. St. Rep. 216, note.]

On the merits plaintiffs contend the transfer was in trust for the sole purpose of aiding the company to procure a loan to cover the construction of a new hotel building. Defendant contends the transfer was a gift.

An outline of the facts leading to the transfer follows:

The capital stock of the Central Hotel Company consisted of 1250 shares of paid up stock of the par value of $100 per share, of which Joseph A. Huegel owned 1247 shares. It was a family corporation and the company conducted a hotel at the corner of High and Jefferson streets in Jefferson City, Missouri. On June 1, 1906, bonds were issued by the company in the sum of $40,000, secured by a first mortgage on the east part of the lot on which the building was located. The proceeds of the bonds were used to build an addition to the north end of the building and along Jefferson Street. New furniture and decorations increased the indebtedness. The business

prospered and the net earnings were used to reduce the indebtedness. Huegel was then a director of a bank in Jefferson City and had an excellent credit. His first wife died on February 18, 1914, and when he was sixty-five years of age. She left surviving her six adult sons and one adult daughter.

On July 9, 1915, Huegel married the defendant, a widow, thirty-five years of age. The business continued as before the marriage and held its own during the war. But against the advice of the company's bankers, and about the year 1917, a Pagoda Garden was installed in the basement of the building with borrowed money and at a cost of $3500. This was a failure and abandoned. About this time (it does not appear if before or after the installation of the Pagoda Garden) they built an addition to the west side of the building at a cost of $30,000. Money was borrowed for this purpose and additional indebtedness incurred for furniture and decorations. It was this venture that forced Huegel's resignation as a director of the bank and injured his credit.

Thereafter the indebtedness continued to increase. The company was unable to pay current expenses and two of the sons advanced money to pay interest. Meantime, and in 1920, prohibition closed the saloon in the hotel, which tended to reduce the earnings. Conferences with creditors, including the bondholders, finally resulted in an issue of bonds in the sum of $110,000, secured by a mortgage on the real estate and personal property of the company. These bonds were used to pay the original bonds and other indebtedness. Thereafter, just when does not appear, Mr. and Mrs. Huegel concluded that a new hotel building was necessary to the success of the business. They fixed $450,000 as the amount needed to pay the bonds and the cost of a new building.

In 1922 Mrs. Huegel asked Mr. Priest, an attorney in St. Louis, to aid them in procuring a loan for this purpose. Priest submitted the matter to the Van Raalte Investment Company. They informed him that Huegel's age made the loan undesirable, for the reason he could not procure life insurance as additional security, and for the further reason his age might interfere with a continuity of management. The company suggested that the stock owned by Huegel "be transferred into Mrs. Huegel's name." Huegel was so informed. This was the origin of the plan to transfer the stock. The effort to procure the loan from the Van Raalte Investment Company was a failure. Thereafter Mr. and Mrs. Huegel had conferences extending over a period of years with architects presenting plans and specifications for a new building and with persons representing loan companies. Mrs. Huegel during this period was urging a new building and was active in these conferences. About this time Mr. Huegel came to believe that the local banks were insisting on the payment of his indebtedness to them in an effort to take from him

the hotel property. There was no foundation for this belief. Thereafter on November 18, 1924, Huegel made to defendant a written assignment of his stock in the company on the back of his stock certificate, and on November 26, 1924, they went to the Central Missouri Trust Company, rented a lock box in Mrs. Huegel's name, and placed the certificate therein. About this time the insistence of the owners of the over-due bonds forced the company in April, 1925, to negotiate a loan for $105,000 from the Continental Life Insurance Company, which money was used to pay the bonds and other indebtedness.

We now consider the testimony. In doing so we eliminate the testimony of Huegel's children tending to show that Huegel stated in the absence of his wife "that he had put the stock in his wife's name, but they had an understanding that if he should die, the property would revert back to the children." Also: "I have papers to show it will revert to me." And, also: "This hotel is in her name for a certain purpose, but that's all fixed so that that's just a temporary proposition." This testimony was admissible as tending to show the condition of Huegel's mind, but it is no evidence of the truth of those statements.

On the purpose of the transfer Mr. McIlwain testified for the defendant that he was assistant manager of the Central Hotel Company; that he had been with the company as assistant clerk, clerk, assistant manager and secretary of the corporation for nine years. As to the transfer of the stock he testified as follows:

"Q. Were you trying to get a loan at that time? A. Yes.

"Q. And that was the purpose of doing it? A. I think it was.

"Q. You think that was the purpose of making that transfer? A. I think so.

"Q. Did he say to you that was the purpose? A. No, he did not.

"Q. You helped to execute a will for him? A. Yes, sir.

"Q. And the purpose of that will was to carry out the same thing? A. I believe it was.

"Q. You talked to him—you know it was? A. I never read the contents of the will.

"Q. But you understood at the time from Mr. Huegel that that was the purpose of making a will? A. He couldn't get a loan without it, I understand.

"Q. You said it was for the purpose of getting this loan? A. Yes.

"Q. And you know the purpose for which the transfer was made? A. In order to get the loan.

"Q. You knew it wasn't an absolute gift without any strings to it? A. He had always intended to give it to her he told me—that's what he always told me.

"Q. They had been trying to get a loan from several other people? A. Yes.

"Q. And was this transfer made to get this particular loan or some other loan? A. Any loan.

"Q. Any loan they might be able to get—you heard Mrs. Huegel say it was necessary the stock had to be in her name? A. Yes, I believe I did.

"Q. She said it would be necessary to take insurance? A. I think so."

Mr. Stockard also testified for the defendant that he wrote a will for Joseph A. Huegel; that in preparing to do so he had several conferences with him about the matter, and further testified with reference to the transfer of the stock as follows:

"Q. Did he ever give you any reason for having given the stock to his wife? A. In the first place I couldn't say that he did, but he told me he had given the stock to his wife and he was trying to liquidate indebtedness; in other words, change it, and it seemed he was having some trouble with his local banker here in town and he told me he had been attempting to get some loans or a bond floated or something, and that he had gone up against this proposition in St. Louis or Kansas City, wherever he had been, that they regarded him as being too old to get behind the business proposition and he said they were somewhat in doubt about the status of his hotel and he said he wanted his will written and everything so it would show this stock was conveyed to his wife—that she was going to get it all and that he wanted it so she could make it.

"Q. You say he was having some trouble in getting some loans? A. Yes, sir.

"Q. And he wanted this will and the transfer made so he could show to the bonding company—A. (Interrupting): That seemed to enter into it.

"Q. He had to do this in order to get this loan? A. He told me he had already made the transfer of the stock to her, but they wanted it consummated so there would be no question about it."

The testimony of these witnesses, considered with other facts and circumstances in evidence, convinces us the transfer was made at the time to aid the company in procuring a loan, and it was made at the time solely for said purpose. Indeed, defendant so states in her brief. But she contends the transfer also conveyed to her the beneficial interest. In this situation she cannot avail herself of the presumption that the transfer was a gift. It follows she has the burden of establishing that fact by clear and convincing evidence. On this question she claims the will of Huegel tends to show his intention. The pertinent part thereof follows:

"I, having heretofore given, delivered and caused to be transferred to my wife, Mary M. Huegel, all my shares of stock in the

Central Hotel Company, Incorporated, and having had the same properly transferred to her on the books of said corporation, I do now hereby ratify said gift and assignment as one of my bequests to her . . ."

At the time the will was executed, Huegel had neither assigned, delivered nor transferred the stock on the books of the corporation to the defendant. Therefore, there was nothing to ratify. However, in offering the will in evidence she said:

"I am going to offer the last will and testament of Joseph A. Huegel in evidence, but only to indicate the state of his mind and what he understood," etc.

Having limited the clause as evidence only for that purpose, we cannot consider it as evidence for another purpose. Defendant should have availed herself of the offer of the court at the time the amendment was made to the petition to re-offer the will in evidence under the issue tendered by the second count. [Ross v. Duane et al., 27 Cal. 565; Henry v. Everts, 29 Cal. 610; Skov v. Coffin, 137 S. W. 450; Cooper, Admr. v. Eastern Trans. Co., 75 N. Y. 116; Williams et al. v. Chapman, 7 Ga. 467.]

Further testimony on the question follows:

Mr. Priest testified that in 1922 his loan company suggested the stock should "be transferred into Mrs. Huegel's name;" that when so informed Huegel said: "That is all right." And, "I believe, if my memory serves me correctly," also said: "That he wanted 'Mama,' I believe he called her, to have the stock anyway." .

Mr. Gordon testified that he had a contract with the hotel company to secure a loan; that no representations were made to him by Huegel as to who owned the stock in the hotel; that he thought Huegel told him he had transferred his property to Mrs. Huegel, but he would not be certain about that.

Mr. Stockard testified that Huegel said he wanted his will written to show the stock was conveyed to his wife; that she was going to get it all and that he wanted it so she could make it; that he did not remember if Huegel said "transferred" or "given" to her; that he said the stock was hers, as she had come to him at a time when he had to have her and she had helped make it and it was hers; that Huegel told him during the time they were conferring about the will that he had given her the stock; that he wanted the will so there would be no question about it; that he wanted the will to reaffirm the gift or sale or ownership of the stock; and that he wanted it made so it would settle the question.

Mr. Newkam testified that he was called from the lobby of the hotel upstairs by Mr. Huegel. He did not remember the date, but it must have been on or about the 18th of November, 1924. Mr. Huegel there called Newkam's attention to a written assignment of his stock to Mrs. Huegel. Newkam testified that he did not .

remember whether Mr. Huegel said he was transferring or giving the stock to her.

Mr. McIlwain, secretary of the hotel company, testified that Huegel (it does not appear when) told him he had given the stock to defendant.

Judge Elder testified that at Huegel's request he tried to aid them in procuring a loan to refinance the company and construct a building; that the company he interested in making the loan did not make any inquiry as to the ownership of the stock; that inquiry was made as to the nature, location and value of the property; that the effort to procure the loan was unsuccessful; that during a conference with the Huegels about their affairs, Huegel mentioned a will; that he believed Mrs. Huegel was present at the time; that Huegel gave him "to understand that he had taken care of Mrs. Huegel so that if anything should happen to him she would be provided for;" that he believed Huegel at one time mentioned making a transfer of his stock; that he did not remember his exact words and remembered no reason given for the transfer "other than the desire to provide for her after his death;" that he had the impression that Huegel "intended her to go along as she had been and for her to continue to look after the hotel."

Judge Hamilton, who had been friendly with Huegel for several years, testified that Huegel said (it does not appear when) he had "fixed matters so that his wife would not have any trouble." "Just exactly what he said along that line, I cannot say. I think he said that he had some of his property or stock in his wife's name; that she would not have any trouble, or he had transferred to his wife so she would not have any trouble with his children."

Frank Curry, representing a material or construction company, testified that in the spring of 1926 he talked to Huegel about a new hotel building and that "he said he had things fixed so if anything would happen to him things would go on just the same."

This testimony does not convince us the transfer was a gift. The testimony of Gordon does not tend to so show, and a gift cannot be established by the belief of Priest that Huegel stated to him that he wanted " 'Mama' to have the stock anyway." If he made the statement, he may have so intended at that time, but this does not tend to show that two years thereafter he gave her the stock by the transfer. At the time he may have thought of giving her the property by will. In considering the weight to be given the testimony of Stockard, the chancellor would not overlook the fact that at the time the will was executed, the stock had neither been assigned nor delivered to defendant, and he would also consider that instead of defendant making the business, the indebtedness of the company had increased from the time of the second marriage. The testimony of Newkam does not tend to show a gift, and while McIlwain tes-

tified that Huegel told him he had given the stock to defendant, it may be he thought he had done so by will. Judges Elder and Hamilton in their testimony did not undertake to give the statements of Huegel, but testified to the impression they then had of what Huegel stated to them. The testimony of these witnesses may tend to show that he intended at the time he made the statements to will the stock to defendant. On the other hand, it should be noted that this stock was about all the property owned by Huegel; that it was two years before he reached a condition of mind to even assign the stock, and some days after having done so he went with his wife to the Central Missouri Trust Company where Mrs. Huegel rented a lock box and they requested Mr. Cook, vice-president of the company, to witness the transfer of the stock. About the matter, Cook testified as follows:

"Q. What was said about why they wanted you to witness it? A. Well, the statement was made by Colonel Huegel that he wanted to place this stock in the hands of Mrs. Huegel for a particular reason and they wanted me to witness the transaction; that he wanted to rent the box at the time in her name and that she alone was to have access to the box and asked me to remember the fact the stock had been transferred to her; the amount of the stock was not shown to me that date; they had it in their hands and asked me to arrange for the box and I took them downstairs; I didn't know why I should witness the transfer, but the box was rented and the securities placed in the box and they left.

"Q. Did he say anything about the transaction being a gift to his wife? A. I have no recollection of any such thing as that being figured; he just stated he wanted me to witness the transfer of the stock to Mrs. Huegel, doing it for a particular purpose.

"Q. What was said, if anything, about it being temporary—if anything at all was said? A. Well, I wouldn't be positive who the statement was made by, but there was a statement made—

"Mr. Barnett (interrupting): We object—we want to know which or who made the statement.

"The Witness: They were both there and either Colonel or Mrs. Huegel said that was for a particular temporary reason.

"Cross-Examination.

"Q. When you first told it you said it was for a particular purpose—now you say temporary purpose. A. The conversation is just about as I remember it—I don't suppose I would have remembered it had it not been for the fact I was asked to witness the transfer, which was very unusual.

"Q. You first said the transfer was made for a particular purpose, but later you stuck in the word 'temporary;' now, after this lapse of time, are you sure the word 'temporary' was in there? A. The

first conversation was upstairs in the upper office and the later conversation was in the safe-deposit department.

"Q. Mr. Cook, your brother is one of the lawyers for the plaintiffs in this case, is he not? A. Seems to be.

"Q. You suggested to Mrs. Huegel she ought to settle this case, didn't you? A. I don't remember that, but it's always my advice to settle any lawsuit.

"Q. Yes, but you are not in this lawsuit? A. I don't remember.

"Q. Lawrence Barnett, my brother, interviewed you about what you knew about this transaction, did he not? A. Yes, sir, some ten days ago.

"Q. At that time you told him you didn't know whether Mr. Huegel made any statements or not concerning the stock? A. I told him I would have to look up my records and see what could be found.

"Q. Is there anything about the date of that—did you find anything on that record that recalled this transaction to you? A. After I discussed the matter with the manager of our safe-deposit department I recalled it.

"Q. You told him you didn't know whether the hotel certificates were put in the bank or not? A. I didn't remember at that time, no sir.

"Q. You did tell him—. A. (Interrupting): I told him if he wanted to come back after I had looked up our records I would be glad to talk to him; I told him I didn't remember any of the details at the time he talked to me.

"Q. But after looking up that date— A. (Interrupting): After discussing the matter with the manager of our safe-deposit vault I remembered more about it."

Mr. Morse, one of the agents representing the Huegels in procuring the loan in 1925 from the Continental Life Insurance Company, testified that he held conferences with Mr. and Mrs. Huegel in 1925 regarding a loan for the company, and with reference to the transfer of the stock testified:

"Q. Did you have more than one conversation with them? A. Yes, sir, several of them.

"Q. Who did they tell you owned the stock? A. Mr. Huegel.

"Q. Who did most of the talking about this loan, Mr. Morse? A. Mrs. Huegel.

"Q. Did you plan with her in regard to the loan and then get his consent later? A. Yes.

"Q. That was the way it was usually carried on? A. Yes.

"Q. How late in the spring of 1925 did they make that statement to you? A. About the time we commenced the negotiations; I was down here two or three weeks before the convening of the Legislature and I think that is about the time they took up the question

of making the loan; that did not come up until after Mr. Bowlin and Mr. Babler came here and appraised the property."

Mr. Babler, who, with Mr. Morse, represented the hotel company in procuring the loan from the Continental Life Insurance Company, testified that Mrs. Huegel assured him she would continue in the management of the hotel. "I would not say control, I would say management."

About six months before his death Mr. Huegel wrote a letter to defendant, enclosed it in sealed envelope, directed the envelope to her, to be opened after his death, and placed it in a safe at the hotel.

Defendant leans heavily on this letter. It was delivered to her after his death and she delivered it to her attorney unopened. She must have known the letter referred to the property, otherwise she would have assumed it was personal and kept it for herself. A copy of the letter follows:

"Central Hotel Company,
"Jefferson City Mo. 10/12/1926

"To My Dear Wife Mary.

"When you read this after my Deth, dont get worried, keep your Nerve, as I allways told you keep your Nerve, and Look after my Business, as long as you live. Pay all my Bills as you get along. Keep same in shape as I allways have done, and you will pay out. and ther will be plenty left for yourself. Look after Eugeen Huegel, and when you redy to settle, with him, dont forget all my Grand Children, all alike. My own Chiltren Charles, Lorens Henry Louis & Josephine $5.00 Five Dollars Each. after my Deth, the above is my last wish.

"J. A. HUEGEL."

The first part of the letter refers to the hotel as his business, and refers to the debts of the hotel as his debts. Of course, she could not look after Eugene (simple-minded son of deceased) and remember the grandchildren if she did not after his death own the property; but he may have thought she would own the property by will.

We think the court ruled correctly in finding the transfer of the stock was for the sole purpose of aiding the company in procuring a loan to rebuild the hotel.

Even so, defendant contends the purpose of the transfer did not fail, for thereafter the hotel company borrowed from the insurance company money to pay its outstanding bonds and other indebtedness.

The purpose of the transfer was in aid of a loan to rebuild the hotel. The Huegels continued their efforts to procure a loan for that purpose until the company's local creditors became so insistent that they were compelled to abandon that idea and center their efforts on procuring a loan to pay said creditors. The activi-

ties and considerations leading to a loan from the insurance company are disclosed by the testimony of the following witnesses:

Judge Revelle, director of the Continental Life Insurance Company, testified that in February, 1925, he reported to the board of directors of the company that he regarded the property (Central Hotel) of sufficient value to justify the loan of $105,000, particularly as long as the hotel was managed by Mrs. Huegel; that at the time he made the recommendation he was under the impression that a majority of the stock was owned by her; that he would not have recommended or voted for the loan if the hotel had not been under competent management; that he regarded Mrs. Huegel as such a manager; that he did not know at the time he recommended the loan and did not know at the time he was testifying that the stock had been transferred, and that he had no knowledge of a demand made by his company that the stock be transferred to Mrs. Huegel before the loan would be approved; that his present impression was at the time the loan was made he was under the impression that a majority of the stock was in her name; that he understood at the time that the property belonged to a corporation and that Huegel was the principal owner of it; but that he was under the impression that at least a majority of the stock was in her name; that he did not know how she had gotten it.

Mr. Bowlin, director of the Continental Life Insurance Company, testified that the application for the loan stated that the hotel was owned by a corporation and that a majority of the stock was owned by Mrs. Huegel; that he did not endeavor to learn who owned the stock; that he would not have voted for the loan knowing that Mr. Huegel owned the stock; that continuity of management is a matter for consideration in making a loan; that he would not say the company would decline a loan on that account, but it would have a "moral influence" on it; that in making this loan he was guided largely by the application and the value of the security, the little farm, the building and the ground.

Mr. Mills, director of the Continental Life Insurance Company, testified that the question of the control of the hotel was not discussed at the meeting of the directors when the loan was approved, but that Judge Revelle stated that he knew the present managing head, Mrs. Huegel, and his impression was that she was a "live wire" and a good hotel manager, and recommended the loan; that there was no discussion about Mrs. Huegel being the owner of the hotel.

It is clear from the testimony of these directors that the ownership of the stock was not a consideration for the loan. One of them testified the question was not mentioned. Another testified differently, and Judge Revelle testified that he was under the impression she owned a majority of the stock. The properties under the management of Mrs. Huegel was the security for the loan.

⸳,At the end defendant invokes the "clean hands doctrine." She contends that if the transfer was not a gift, Huegel was guilty of fraud in that a "continuity of competent management" was not provided. There is no evidence to sustain the contention, for the stock was conveyed in trust for the use of defendant in controlling the management of the hotel during the life of any loan negotiated for the purpose of rebuilding the hotel. For this and other reasons the contention is overruled.

It follows the judgment should be affirmed. It is so ordered. All concur.