TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Plaintiff-Appellant, v. JOHN J. SCHMIDT, Executor of the Estate of ERNEST W. ALY, CHARLES P. NOELL and JOSEFINA AMERIGO ALY, Defendants-Respondents.—163 S. W. (2d) 772.

Division Two, June 17, 1942.

Rehearing Denied, July 28, 1942.

Motion to Transfer to Banc Overruled, July 28, 1942.

*Carleton S. Hadley, Arnot L. Sheppard, William A. Thie* and *Walter N. Davis* for appellant.

*Cox, Blair & Kooreman* for John J. Schmidt, Executor of the Estate of Ernest W. Aly, et al.

*A. H. Heidsieck* and *Gus O. Nations* for Josefina Amerigo Aly.

*Hay & Flanagan* and *Claudio Delitala* for respondent Charles P. Noell.

BOHLING, C.—This is a suit in equity to set aside and to enjoin, for alleged fraud in its procurement, the collection of a judgment for $40,000, damages awarded Ernest W. Aly in an action at law against Terminal Railroad Association of St. Louis, a corporation. The Terminal Railroad Association of St. Louis (designated Terminal hereafter) is the plaintiff and John J. Schmidt, executor of the estate of Ernest W. Aly, deceased, Charles P. Noell, an attorney who represented Aly in the damage suit, and Josefina Amerigo Aly, Aly's widow, are the defendants here. The chancellor found for the defendants, dismissed plaintiff's bill, and plaintiff has appealed.

Early Friday morning January 13, 1939, Aly shot and killed himself. Mr. Mothershead, the funeral director, found four sealed, stamped, and addressed envelopes near Mr. Aly's body. The letters were in Aly's handwriting, signed by him, and dated January 12, 1939. The envelopes were ▮ addressed to Paul Aly, Mr. Noell, Mr. E. J. Johnson, and Mr. James Perry. The latter two were employees of the Terminal. Mr. Mothershead took the body and the letters with him. Aly made no requests and left no directions with respect to the letters; but, receiving instructions from the Coroner, Mr. Mothershead mailed the letters. The Johnson and Perry envelopes contained two letters each, the other two letters being addressed to attorneys for the Terminal. The letters addressed to the Terminal employees were of the same import. The letter to Mr. John-

son read: "Your Co. does not owe me any thing on my case as it was faked fixed and framed."

The letter to Paul Aly, so far as deemed material, read: "Keep away from courts and all lawyers and you will be money ahead. . . . Bro please look after poor Old Mother as I have been a burden on her the last nine years. Bro try to live a straight life and you will be better off than I." We detail the facts leading up to the writing of the letters and Aly's suicide hereinafter.

The case of Aly v. Terminal Railroad Association was tried three times. Aly was injured October 25,.1929. He was at the time forty-two years of age and was engaged in the performance of his duties in interstate commerce in the yards at St. Louis for the Terminal as switch foreman. The switch engine was backing, drawing three cars, at about ten miles per hour, approaching Aly, and when he attempted to board the footboard of the tank, he, according to his testimony, was caused to fall by reason of the footboard slipping sideways—towards the coupler—about an inch, with the result that both of his legs were cut off above the knees. Aly sued in January, 1930, grounding his action for damages on the Terminal's alleged violation of the Federal Boiler Inspection Act, 45 U. S. C. A., sec. 22 et seq. The first trial resulted in a verdict for the Terminal on April 28, 1931. Upon appeal, the judgment was reversed and the cause remanded. [See Aly v. Terminal Rd. Assn., 336 Mo. 340, 78 S. W. (2d) 851.] The second trial resulted in a verdict for Aly for $55,000 on April 26, 1935. The trial court was of opinion the verdict was excessive and ordered a remittitur of $25,000. This, Aly refused to comply with, and a new trial was awarded the Terminal. The third trial resulted in a verdict of $85,000 for Aly on January 8, 1936. This judgment was affirmed on May 3, 1938, on condition of Aly entering a remittitur of $45,000 (which he did), and a rehearing was denied August 17, 1938. [See Aly v. Terminal Rd. Assn., 342 Mo. 1116, 119 S. W. (2d) 363.] Thereafter, on December 19, 1938, the United States Supreme Court denied the Terminal's petition for certiorari. [See Terminal Rd. Assn. v. Aly, 305 U. S. 655.] The hotly contested and real factual issue in these trials was whether the footboard shifted or slipped sideways about an inch. The charge of fraud in the procurement of the judgment in the Terminal's bill in the instant case is to the effect that Aly's unsupported testimony that the footboard moved or shifted was false and fraudulent; that Aly concealed said fact and prevented the Terminal presenting said defense as an issue in his case; that the Terminal could not have discovered said fraud by the highest exercise of care, and had no information Aly's said case had been faked, fixed, and framed until the receipt by employees of the Terminal, after Aly's death, of letters from Aly stating his case was "faked, fixed, and framed." The records, including the evidence, of the first and third trials of Aly

v. Terminal Rd. Ass'n are preserved in the instant bill of exceptions. On the issue there was evidence pro and con. Notwithstanding the Terminal's assertions of error in this court and in its petition for certiorari to the United States Supreme Court that there was no substantial evidence the footboard shifted to the side, the determinations of the courts on the law involved and the juries on the facts were contra. The evidence on this issue is narrated in the opinions of this court and is not repeated here.

In addition to a renewal of its contention of the improbability that the footboard shifted sideways as Aly testified in his lawsuit, the Terminal argues that Aly would not have written the letters stating that his case had been faked, fixed, and framed immediately before committing suicide, and written his brother advising him he would be money ahead if he kept away from all courts and lawyers and would be better off than Aly if he lived a straight life, if his case had not been faked, fixed, and framed; or Aly's lawyer would not have said to one of the Terminal's lawyers that if he ever had another case involving a footboard, it would not move sideways if the case had not been faked, fixed, and ▆▆▆ framed. Defendants argue that it was for the jury, as held, whether the footboard shifted as Aly testified; that the letters were the result of Aly's intense dislike for his wife and not the result of a desire to right a wrong brought on by qualms of his conscience; and, in any event, the Terminal had failed to establish its case beyond a reasonable doubt. This, on the issue of the credibility of the witnesses and the weight and value of the evidence without entering upon a discussion of certain legal principles involved, concerning which we make no observations.

▆▆ The burden was on the Terminal to establish the fraud charged to have been practiced upon it and the court in the procurement of the judgment by evidence so clear, strong, and cogent as to leave no room for reasonable doubt of its existence in the mind of the chancellor. Lieber v. Lieber (Banc), 239 Mo. 1, 31(a), 143 S. W. 458, 467(a); Elliott v. McCormick, 323 Mo. 263, 274, 19 S. W. (2d) 654, 658[1], citing cases. Merely substantial evidence is insufficient. State ex rel. v. Shain, 344 Mo. 891, 897, 129 S. W. (2d) 1048, 1051 [7, 10]. The Terminal, on this review, is confronted with the additional obstacle in the findings nisi to the effect that the statements in the letters it stresses were not true in fact but were written at a time when Aly was "overwhelmed with emotions of fear and hatred of his wife, and dread of penury and woe of a hopeless future," and to effect his repeated intention and in the belief such action and his death were the only means of preventing his wife receiving some part of the judgment. Conrad v. Diehl, 344 Mo. 811, 822, 129 S. W. (2d) 870, 876[5-7]; Rhoads v. Rhoads, 342 Mo. 934, 940[1], 119 S. W. (2d) 247, 248[3].

■ The Terminal objected to the admission of certain evidence hereinafter set forth covering statements of Aly, oral and written, on the ground such evidence was self-serving and hearsay. Defendants offered this testimony for the stated purpose of showing Aly's state of mind and not for the purpose of establishing the truth of Aly's said statements. The evidence was admissible in the circumstances of the instant case for the stated purpose. Platt v. Huegel, 326 Mo. 776, 784, 32 S. W. (2d) 605, 607[3]; Bush v. Bush, 87 Mo. 480, 486; Thomas v. Thomas (Banc), 186 S. W. 993, 999[11]; Fuller v. Robinson, 230 Mo. 22, 39(I), 130 S. W. 343, 348(1), Ann. Cas. 1912A, 938. See 6 Wigmore on Evidence (3 Ed.), p. 93, sec. 1730.

■ Judge Walter N. Davis, counsel for the Terminal, testified that on January 8, 1936, after the jury had retired to deliberate on their verdict, he was talking with Mr. Noell, Aly's attorney, and told him "that under our evidence I didn't see how it [the footboard] could move sideways. 'Well,' he said then, 'I know a good deal more about the footboards now than I did then, and if I ever have another case involving them, they will never move sideways;'" that early in February, 1939 (the Terminal's bill having been filed January 21, 1939), he met Mr. Noell in the St. Louis Law Library; that Noell complained about the publication of the contents of Mr. Aly's letters to the employees of the Terminal in a St. Louis daily newspaper; that witness said: "'I had no intention of your knowing anything about that until after this suit was filed,' and then he said, 'Well, I saw those letters down in De Soto at the undertaker's office, and if I had known what was in them, you never would have gotten them.'" On cross-examination he testified that for the purposes of the third trial, Mr. Noell made a demand on the Terminal to produce the footboard involved; that the Terminal had destroyed the footboard without witness' knowledge or consent and a replica was produced in court; that he considered his conversation with Mr. Noell while the jury was deliberating a significant and not a trivial matter; that he thought Noell was conveying the suggestion that there had been false testimony with respect to the footboard; that the jury returned a verdict against the Terminal for $85,000; that the conversation was not proper subject-matter for the Terminal's motion for new trial but, in the light of Aly's letters, should now receive consideration; that Mr. Noell, at the time of the conversation in the law library, resented the publication of Aly's letters because the blame would be placed on him; that he considered Noell was not "kidding," as Noell had previously told him that in another case he, Noell, had had a witness write him a letter demanding $500 for testifying in his client's favor and when the Terminal put the witness on the stand, he, Noell, "burnt him up;" that he gave this as a reason for belief in Noell's statements; and that according to the Aly's letters Aly "faked, fixed, and framed" the case.

Clarence W. Wofford, a locomotive fireman for the Terminal, testified that at the time of Aly's accident he was working for the Terminal and had a first and only conversation with Aly at the hospital in which Aly said he stepped up on the rail with one foot and stepped on the footboard with the other foot, and his foot slipped off the rail, and it threw him off balance till he couldn't catch a hold any more; that, although he continued working for the Terminal until January, 1931, and returned to work for the Terminal in July, 1936, he never heard about Aly's lawsuit or the investigation made by the Terminal; and that he read about the matter in 1939, after Aly's death, and then first made known his conversation with Aly.

Mr. Charles P. Noell, testifying in his behalf, denied making the statements attributed to him by Judge Davis that he would not have another footboard slipping sideways and would have destroyed the letters addressed to the Terminal employees. He undertook to explain the only logical way a footboard could move was laterally or sideways because of the force exerted against it. Noell testified that he served notice on the Terminal to produce the footboard for the third trial; that a witness testified it had been destroyed, and that the Terminal produced what was identified as a replica of the footboard; and that he argued the Terminal's failure to produce the footboard at the first and second trials.

There is no evidence of record that Aly's mental condition was other than normal except on occasions when he became agitated concerning his relations with his wife. She was a Mexican. They were married in the Spring of 1929. After his accident she was with him at the hospital and at John W. Reed's (Aly's brother-in-law's) home, to which he was first removed after leaving the hospital. In February, 1930, he was taken to his mother's home near Blackwell, Missouri. He remained there until his suicide January 13, 1939—a period of over nine years.

Mrs. Lulu Aly, Aly's mother, testified that Aly's wife threatened to leave him while he was in the hospital and told him while at Mr. Reed's that she was leaving him, wouldn't wait on him. Mr. Reed testified that while Aly was in the hospital and at his home, Aly's wife forged his name to his pay check and cashed it; that she took Aly's automobile; that she would come to the hospital and demand money and he would give it to her; that she was at his home about a month; that she would dress in the morning, demand money, go out and return at nine or ten o'clock in the evening; that she left Aly February 8, 1930, came back the next day, demanded money and Aly gave her $40; that the next day she wanted $60, which Aly refused to give her; that she told Aly: "you got your legs off, you are no good;" and that Aly feared his wife and wanted to go to the country. Later, while witness was visiting Aly in the country, Aly's wife came to the house but Aly refused to see her, whereupon, she

broke all the windows out of witness' car, parkd nearby. Thereafter, she came to witness' home and he had her arrested to keep her away.

Charles P. Noell, Aly's attorney, also testified that Aly, while in the hospital talked to him about and was disturbed over his wife taking his automobile, pay check, and some other things and disposing of them. Aly wrote Noell, February 28, 1930, as follows: "if you can find out any thing about that woman let me know by mail . . . This woman came over on 12th St. the night of Feb 26 about 9 oclock with 2 men and wanted me to sign papers for her that she had wrote." Another, dated May 9, 1930: "Will write you telling you I think there will have to be some course taken to curb this wife of mine. [He then mentions his refusal to see his wife and his wife breaking the glass in Reed's automobile.] Looks like there would be some law to curb a person like this." Another, bearing the date of only "May 11," evidently 1930, asks about a divorce, offering to pay $500, and in which Aly wanted to charge his wife with "desertion and running around with other men," stating "that woman left me Feb 18, 1930 the last time I saw her she had 2 foreign looking men with her looked like gunman to me" and that the landlord "saw this woman with other men and so did his wife and they heard her raise hell." "the woman has the marriage licence with her and also my divorce from my first wife." Aly instituted a suit for divorce in 1930. Mrs. Aly secured an allowance for alimony pendente lite and attorney fees, we understand, totaling $740. Aly refused to pay this and later dismissed his action.

Notwithstanding Aly had lost his first trial before a jury he refused to comply with the court's order to enter a remittitur of $25,000 from the $55,000 verdict he received at the second trial, April 26, 1935, and chose to take his chances before a third jury.

The Terminal's motion for a rehearing was overruled August 17, 1938, and Aly's judgment stood affirmed for $40,000. Aly had not seen his wife since she left him in 1930. We understand he was under the impression his first divorce suit had been "thrown out." He consulted Thomas A. Mathews, an attorney, who, on September 10, 1938, instituted an action for divorce on his behalf. Mr. Mathews testified to conversations had with Aly while his divorce proceeding was pending. He said that Aly told him they had separated in 1930; that she spent his money, forged his name to checks and when he cautioned her, she told him it was none of his damn business; that she came to his room with two men on one occasion; that she told him he was no good, she did not have any further use for him; that she kept company with other men; and that he had a considerable sum of money coming to him as the result of a damage suit. On September 19, 1938, Aly wrote Mathews stating he was enclosing a letter received by his wife from a St. Louis lawyer and a registered letter from her. We quote from Aly's letter: "She is only asking

for $38,000 out of .a $40,000 settlement. This sounds like a lot of Hooie and I don't think I will ans any thing from her or the Shyster in case he writes me. Kindly let me know if you think I am within the law by ignoring these people." The letter from the St. Louis lawyer, bears date of May 4, 1938, the date following the affirmance of Aly's judgment against the Terminal, and was addressed to Mrs. Ernest W. Aly,¦ Estados Unidos Mexicanos; and informed her that Aly's judgment had been affirmed for $40,000; that he was contemplating running a garnishment on the Terminal "for the alimony he owes you, $38,000.00 dollars, interest, etc." Mrs. Aly's letter to Aly, carried the date line "Mexico, D. F., 15, 1938" and, briefly, demanded "a check for $38,000.00 dollars in payment of full amount of my claim," after stating: "You owes me my alimony for $38,000.00 from 8th day of February, 1930, in my case of divorce," et 'cetera. Mathews also testified that Aly had told him: "If I knew she would get any part of my money I would commit suicide before she would get it." Witness considered Aly insane "on that particular subject alone when you discussed it with him."

It appears that Aly made a trip to St. Louis in December, 1938, staying at Mr. Reed's. Mr. Noell informed Aly a garnishment had been run by his wife against the Terminal in his first divorce suit; that he would have to pay it; and that Aly became angry. Mr. Reed testified Aly told him: "He said he would rather see the Terminal Railroad get every dime than to see that woman have a dime;" that Aly was wrought up, could not sleep, wanted to see the attorney for the Terminal and secure his part of the judgment and thought he could put it where his wife would not get it. Reed thought Aly's condition was "very bad."

Under date of December 23, 1938, following the denial of the Terminal's petition for certiorari by the United States Supreme Court, Aly wrote Noell: "Your letter received and contents noted looks like pay day for us." He then mentioned certain arrangements to be made for his coming to St. Louis. "I am a divorced man .. . . the teacher stole one divorce but this one is in a lock box. . . . I would like for my settlement be kept out of the papers as there are some money hungry thugs that would work for the teacher. . . . I don't think the extorstiners or thugs will have any luck around the courts in Farmington as I believe them people ar square and honest."

Aly's will, executed January 3, 1939, gave half of his estate to his mother and the balance equally to his three children by his first wife. He named John J. Schmidt executor. Mr. Schmidt, President of the American Bank, De Soto, Missouri, testified that Aly informed him his wife was a Mexican and he feared "those Mexicans might bump him off;" that he asked Schmidt if he, as executor, would offer a reward of $1,000 in the event somebody "bumped him off." Dave Pratt, a witness to Aly's will, testified that at the time of its execution

Aly volunteered the statement that he was afraid his wife might have him bumped off and wanted to know if $1,000 of his money could be used to try to find the killer.

Aly was granted a default decree of divorce at the November, 1938, term of court, which did not end until the latter part of January, 1939. A petition to set aside the divorce was filed January 10, 1939. On January 11, 1939, Mr. Mathews wrote Aly, informing him of the petition to set aside his divorce, going into the matter in some detail, and advising him the hearing was set for January 16, 1939, and that in all probability the court would set the judgment aside. Mr. Aly answered Mr. Mathews' letter under date of January 12, 1939, stating he was sick, he had never received his money, asked Mathews to drive down, and (quoting) : ''We will talk my case over. But if it is set aside I am afraid I am sunk. that woman I have never seen since February, 1930 and I know she has been in Mexico since 1931.'' Aly's letter to Noell of January 12, 1939, mentioned receipt of Mathews' letter, stated the hearing to set aside his divorce was set for January 16, 1939, and that he had a lawyer to represent him.

Aly never told his mother or his brother how his accident happened. His brother Paul testified Aly was not a great hand to talk, and his mother testified she ''never cared about hearing it.'' There was testimony no person was disturbing Aly's life other than his wife; that he never indicated to anyone he had done any wrong in connection with his suit for damages, or was not entitled to the damages awarded; and that, aside from his misfortune, his health was good.

Dr. Francis M. Barnes, a neuropathologist, gave as his opinion, based upon a personal acquaintance with Aly (witness had testified at the three trials of Aly's lawsuit against the Terminal) and the testimony in the instant case (a large part of which the witness had personally heard), that Aly's suicide and writing of the letters in connection therewith were the result of an emotional storm preventing straight thinking, brought on by a determination to prevent his wife receiving any of his money, and was not the result of Aly's conscience compelling the righting of a wrong or remorse, that the only reason disclosed for Aly's emotional upsets was his wife; and that Aly had great fear of his wife and others. Witness had not received compensation for his testimony in the three trials and did not expect payment therefor unless Aly's attorney realized some money. He expected payment, however, for his time and services in the instant case.

Dr. Hillel Unterberg, the Terminal's expert on nervous and mental diseases, gave, as his opinion, from reading the testimony, that Aly's conscience, his domestic trouble and the loss of his legs all played a part in Aly's suicide. On cross-examination he testified that Aly was determined his wife should not benefit from his accident and her

marriage; that the four. letters to the Terminal employees indicated there was something wrong with Aly's conscience but failed, although questioned with respect thereto, to state prior factors in his opinion definitely establishing that Aly's action was a desire to right a wrong superinduced by his conscience; and that if there were no faked, fixed, and framed evidence in Aly's case "there would be mighty little basis for my conclusion that conscience played a part."

Aly's letters to the Terminal employees and certain corroborating circumstances tending to establish the truth of the statements therein made constitute the crux of the Terminal's case; but without the letters the corroborating circumstances are of little weight. The evidence on behalf of defendants tended to establish a mental state on the part of Aly of fear of and hatred for his wife and the dread of an abject future to such an extent that he was willing to take his own life rather than that she should receive benefits from their marriage. The letters are the first definite manifestation by Aly of any wrong doing. His refusal to enter a remittitur of $25,000 and accept a judgment for $30,000 after the second trial gives every indication of his belief in his lawsuit. His reaction to the denial of the Terminal's petition for certiorari, as reflected in his letter to Noell of December, 1938, nine years after his injury, was that of elation over the victory and his divorce from his wife, although it indicates a possible fear of her. This was suddenly changed upon the receipt of Mathew's letter on January 12, 1939, advising that the divorce decree would probably be set aside. The record discloses an announced dominant purpose of Aly to prevent his wife receiving any part of his judgment. He indicated a will to kill himself to accomplish this. To merely commit suicide would not effect his objective. To his mind the defeat of his wife called for the defeat of the judgment and the letters to the Terminal's employees. This was the finding of the trial chancellor. It has support in the record. With the Terminal required to establish its case beyond a reasonable doubt and to overcome that deference due the trial court, we are not inclined to interfere on the evidence adduced.

The judgment is affirmed. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.