S. F. WINCHELL, H. F. FINKS, G. C. LINGLE and PAUL MCGEEHAN, former officers and directors and now trustees of the BRINKERHOFF-FARIS TRUST AND SAVINGS COMPANY, a Corporation, whose charter has now expired and/or been forfeited, Appellants, v. I. E. GASKILL, W. W. JOHNSTON and D. R. HARRISON, Commissioner of Finance of the State of Missouri.—No. 39245.—190 S. W. (2d) 266.

Division One, November 5, 1945.

*Ralph P. Johnson, Ike Skelton, James H. Linton, Crouch & Crouch, Cowgill & Popham, Johnson, Lucas, Graves & Fane* and *Sam Mandell* for appellants.

*Horace F. Blackwell, Elmer E. Hall, H. E. Sheppard* and *Wm. G. Boatright* for respondents.

DALTON, C.—Action in equity by the surviving officers and directors of the Brinkerhoff-Faris Trust and Savings Company, a corporation, whose charter had been forfeited and whose assets and affairs had been placed in the hands of the Finance Commissioner of Missouri and liquidated by him, to set aside, on the ground of fraud in its procurement, an order and judgment of the circuit court of Henry County, Missouri, authorizing the commissioner of finance to sell the remaining assets of the corporation to one I. E. Gaskill, for the purpose of paying the creditors of the corporation. Plaintiffs further sought an accounting and other relief. The trial court found the issues for defendants and dismissed plaintiffs' petition. Plaintiffs have appealed.

596 .

 The Brinkerhoff-Faris Trust and Savings Company, herein-
after referred to as the bank, was a banking corporation located at
Clinton, Henry County, Missouri. The bank closed in November, 1932
and was not able to reopen. On February 6, 1933, its affairs were
placed in the hands of the commissioner of finance for liquidation in
conformity with Art. I, Chapter 39, R. S. 1939. W. W. Johnston was
appointed special deputy finance commissioner in charge of liquidation.
Johnston employed Wayman Gracey, a former employee of the bank,
to assist him. The clerical work was done by Loretta Cole and Edith
Wills.

Among the assets of the closed bank was substantially all of the
stock of the Benton Land Company, a subsidiary of the bank. This
company handled and serviced real estate loans. Notes secured by
first deeds of trust on Texas lands were sold to eastern investors and
the company held commission notes secured by second deeds of trust
on the same land. The company collected interest on commission,
looked after the payment of taxes, sometimes advanced funds for that
purpose, looked after foreclosures and frequently took title for the
benefit of itself and the note holders. After the bank was in liquidation
Johnston, Gracey and Cole became officers and directors of the Benton
Land Company. Johnston was president and Gracey secretary-treas-
urer. Thereafter, the Benton Land Company of Texas was organized
to assist in handling business in Texas. Its stock was owned by the
Missouri company. Both of these corporations continued to function
during the period of liquidation and no orders of court were obtained
with reference to the transaction of their business.

The liquidation proceedings were not without the usual difficulties
in the collection and distribution of the assets of the closed bank.
By the close of 1937 the preferred and secured creditors had been
paid in full and 70% had been paid depositors and general creditors.
The cost of continuing the liquidation of the bank was far exceeding
the income from the assets of the trust estate and the commissioner
of finance was pressing the special deputy commissioner to bring the
liquidation to a close as early as possible.

On March 18, 1938 many depositors signed a petition requesting
the commissioner of finance to continue the liquidation ''for at least
a year or perhaps longer,'' on the theory that if the liquidation was
continued ''there is very good hope that the depositors will be paid
in full, and, even if that hope is not realized, that very substantial
dividends can be paid.'' By the summer of 1938 the balance due
depositors and other creditors (except liability to stockholders) had
been reduced to $44,000 and the special deputy commissioner was
trying to negotiate a sale of the remaining assets for enough to pay
the depositors and other creditors of the bank in full.

During 1938 the members of the Faris family, who owned most of
the capital stock of the closed bank, became interested in buying

the remaining assets of the bank on the same basis upon which they were subsequently sold. On July 6, 1938 a list of assets was obtained by these stockholders and some investigation was made. The interested stockholders, however, were unable to raise the necessary funds, and, in addition, their attorney advised mildly against a purchase of the remaining assets. On September 8, 1938 the commissioner of finance wrote the attorney for these stockholders urging that the ideal way to close up matters would be for the stockholders to pay depositors in full and complete the liquidation in the interest of all stockholders. No action, however, was taken. Only two parties were found who indicated a real interest in buying the remaining assets of the bank. They were I. E. Gaskill and William L. Koenig. The best offer obtained from Koenig, after investigation and conferences, was $25,000, but Gaskill indicated that he might go as high as $35,000.

On September 26, 1938 the finance commissioner directed Johnston to "take immediate steps to bring the liquidation . . . to a close as soon as possible." Gaskill was invited to meet with the commissioner of finance and other interested parties at Clinton, Missouri, on October 27, 1938. Representatives of stockholders, depositors and others attended the meeting. Gaskill offered to buy the remaining assets of the bank and pay the amount required to pay depositors in full and the final costs of liquidation. The offer was accepted. A contract was prepared and signed by Gaskill and Commissioner of Finance Holt, subject to the approval of the circuit court. The contract provided that the assets were sold "without warranty or guaranty of any kind and subject to any and all liens thereon and defenses which may be made against the same." Thereafter, Johnston petitioned the circuit court and obtained the order and judgment (now sought to be set aside) approving the contract of sale. No objection was interposed by anyone to the proposed sale. Gaskill paid the balance due depositors and all the remaining cost of liquidation, a total of about $48,000.

Prior to buying the remaining assets of the bank, and while making his investigation of the value of these assets, Gaskill had some dealing with the Benton Land Company. This company had title to several tracts of land in Texas, including a tract of land known as "Tract 293." Title to this tract had been acquired subject to a first deed of trust held by an eastern investor. Mr. Faris of the bank, who had made the original loan and sold the paper, had written the lien holder as follows: "We have obtained title to the property, and that without cost to you, and without releasing your loan; the deed is in the name of one of our subsidiaries, and if times ever get back anything like normal the place should sell for enough to pay your principal, and in fact it ought to sell for enough to pay principal and interest." There was further evidence that the titles obtained by the Benton Land Company upon foreclosure of their second deeds of trust were not

treated as assets, but were held for the mutual protection of the investors and the company. The books of the Benton Land Company did not show the real estate, so held, as an asset of the company and only the stock in the Benton Land Company was listed as an asset of the closed bank.

In October, 1937 Johnston advised the holder of the first deed of trust on tract #293 that, because of "some oil excitement" in Stonewall County, Texas, the land could be leased for $1.00 per acre and $1.00 per acre rental for five years. The lien holder agreed to subordinate his lien to the lease and, thereafter, an oil lease, reserving 1/8 royalty to the owner, was executed. The funds received were applied to the payment of delinquent taxes on the land. On November 2, 1937 one Spangler of Henry County paid $166 for a six months' option to purchase this tract of land for the amount of the principal and interest secured by the first deed of trust. Spangler did not buy the property, nor exercise an option to renew the option. Thereafter, in July, 1938, for a recited consideration of $10.00, not paid, Gaskill was granted a 60 day option to buy this tract on the same basis, to-wit, payment of the principal and interest secured by the first deed of trust. Whether this option was given on July 10th, or July 20th, 1938, is a disputed matter, but the sale or gift of options to purchase such lands in Texas, upon the payment of the amount due the lien holders, seems to have been a common practice of the Benton Land Company in its efforts to protect its eastern investors and to secure the payment of defaulted loans on land that, for the most part, appears to have been worth less than the amount of the liens.

On July 20, 1938 the Benton Land Company was advised that an "oil well promising good" had been drilled on land adjoining "tract #293." Both Johnston and Gracey saw the telegram, but were not particularly impressed by it. Early in August, 1938 this oil well began to produce a high percentage of salt water and continued to do so. Twenty dry holes had previously been drilled in the same vicinity. Gaskill, however, exercised the option to purchase the land and then settled with the lien holder for less than 50% of the amount due. Thereafter, on September 5, 1938, Gaskill sold a one-half interest in the royalties reserved in the lease for $4581.50, but at the time of the trial no well had been drilled on the land.

On December 6, 1938 Spangler sued the Benton Land Company and Johnston on the theory that his option to purchase "tract #293" had been renewed. Depositions were taken December 13, 1938. Spangler contended that his option had been renewed; that he had been defrauded by a pretended sale to Gaskill; and that Johnston and Gaskill were partners. One issue raised was whether the said option was granted to Gaskill before or after information was obtained that oil had been found on adjoining lands. The witnesses testified that the option was given prior to notice that oil had been found in the vicinity.

Johnston and Gaskill denied the existence of any secret agreement. Gracey and Cole also denied any knowledge of such an agreement.

On January 18, 1939 an attorney for the stockholders, after reading these depositions, complained to the finance commissioner about the handling of the assets of the Benton Land Company and stated that "there are certain things that make it look ▇▇▇ like Mr. Johnston may be in with Mr. Gaskill on the purcháse of the assets of the trust."

In view of the evidence that Gaskill had made a profit from his transaction with the Benton Land Company, the affairs of that company were fully investigated. A detailed statement of the receipts and disbursements between March 16, 1933 and January 31, 1939 was prepared and submitted to the parties in interest. No evidence of fraud was found. The representative of the stockholders, who received and considered the report, wrote the commissioner of finance, on May 25, 1939, that "we did not find anything to seriously complain about." An investigation was also made of the charge that Johnston and Gaskill were partners. Johnston, Gracey and Cole denied any participation or sharing in any way in the proceeds of the sale, or any knowledge of such.

The Spangler suit was dismissed June 3, 1939. During the investigation that resulted from that suit, it appeared that the deed of the Benton Land Company to Gaskill for tract #293 required Gaskill to assume and pay the principal and interest secured by the deed of trust. Gaskill was, thereupon, required to pay the unpaid balance due to the lien holder.

The liquidation proceedings were held open until June 16, 1939 to give these appellants and all other interested parties full opportunity to make any investigation desired. Nothing developed and Johnston was discharged and the liquidation proceedings were closed.

In the fall of 1943 Gracey and Cole signed statements to the effect that parts of their testimony in the Spangler depositions were false. Thereafter, in October, 1943, the present suit was instituted. It was charged that Johnston had a secret agreement with Gaskill to share in the profits obtained from the further liquidation of the bank's assets. It was further alleged that Johnston had intimate, actual and accurate information concerning the value of the bank's assets; that the assets were worth $150,000.00; that such fact was known to Johnston and not to the court; that Johnston misrepresented the facts to the court, fraudulently concealed the true facts concerning the value of the said assets, the prospects for oil near the Texas lands and the existence of his unlawful agreement with Gaskill; and that the plaintiffs and the court were induced to approve the sale by reason of false, willful and fraudulent misrepresentations. The commissioner of finance refused to join as a plaintiff in the suit and was made a defendant.

A detailed statement of the evidence in support of the existence of the alleged agreement would unduly extend this opinion; it is sufficient to say that Gracey testified that, on July 20, 1938, Gaskill and Johnston entered into a written agreement to divide equally the profits or losses resulting from the sale of any assets which Gaskill might purchase from the trust estate, and that Johnston agreed to divide his share of any profits equally with Gracey. Gracey further testified that Johnston paid him $500 as his share of profits arising from Gaskill's purchase of tract #293. Miss Cole testified that she had seen such an unsigned memorandum written in Gaskill's handwriting and that she had copied it for Mr. Gracey. A copy of the alleged memorandum was offered in evidence. Delton Houtchens, one of the attorneys for plaintiffs, testified that in May or June, 1943 Gracey employed him, on a contingent fee basis, to collect for him under the alleged contract; that he consulted Johnston, and Johnston "stated that there had been such a contract entered into at one time, but that he himself had never received any money under that contract and that it was later torn up"; and that Johnston later asked him what he would take to forget all about the matter. The testimony of Gracey and Cole with reference to the alleged contract and payment and the testimony of Houtchens as to the alleged admissions was denied by Johnston. Gaskill also expressly denied the existence of any such contract.

In finding for respondents, the trial court necessarily rejected the testimony of Gracey, Cole and Houtchens. It is unnecessary, therefore, to review the detailed facts in evidence affecting the credibility of these witnesses further than to say that Gracey admitted that he had intentionally sworn falsely in the Spangler case; and that Cole admitted she knew that her testimony in the Spangler case was false before she signed the deposition.

Substantially all of the facts upon which appellants rely, except the direct testimony concerning the existence of said agreement, were fully known to them, or their representatives, prior to the discharge of the special deputy commissioner and the final termination of the liquidation proceedings. The correspondence between the commissioner of finance and the attorney for the stockholders shows that in March and June, 1938 the attorney was well aware of the fact that he and his clients believed the assets were worth much more than the balance due depositors. The stockholders were considering a purchase of the assets for that very reason, but they could not raise necessary funds. Liquidation had continued for nearly six years, the cost of continuing the operation of the estate was in excess of the income, and it seems to have been the general opinion that it was time to close the trust estate. There was, of course, the usual difference of opinion between buyers and sellers as to the value of the assets, but, since no buyer could be found willing to pay more, the assets were

sold for what then appeared to be a fair and reasonable basis and the liquidation proceedings were closed.

Appellants assign error (1) on the finding for respondents; (2) on the exclusion of evidence; and (3) on the refusal of a commission to take the testimony of an absent witness. Respondents contend (1) that appellants have no legal capacity to maintain this suit; (2) that appellants were guilty of laches in asserting their claim of fraud; (3) that the evidence of fraud was not clear, cogent or convincing; and (4) that the court did not err in excluding evidence or refusing the commission. In view of the conclusions we have reached, we will assume, without deciding, that appellants have the legal capacity to maintain the action and that they are not barred by laches. We will determine the other issues presented.

■ Did the court err in excluding evidence? Wayman Gracey testified that, after Gaskill had exercised the option to purchase tract #293 and after Gaskill had sold a one-half interest in the royalties under the lease, Johnston paid him (Gracey) $500 in currency on the first of October or November, 1938 as his ¼ of the profits made by Gaskill on the purchase. Gracey further testified that he paid $400 of the money to the Union State Bank of Clinton on a note. Appellants offered to prove by witness Emory Hurt, President of the Union State Bank, that on November 1, 1938, Gracey paid off a $400 note to the bank with currency. The evidence was excluded. Appellants rely on Charles H. Fuller Co. v. St. Louis Wholesale Drug Co., 219 Mo. App. 519, 282 S. W. 535, 538; Peppas v. H. Ehrlich & Sons Mfg. Co., 228 Mo. App. 556, 71 S. W. (2d) 821, 825; State v. McDowell, 214 Mo. 334, 342, 113 S. W. 1113. These cases do not aid appellants because in each case the evidence considered was material to the determination of an issue in the case, while here the fact that Gracey had $400 in currency or that he paid the same on a note was not material or in dispute. The issue was whether Gracey had received the currency from Johnston and whether it was paid to him under an agreement to share the profits on assets sold to Gaskill. The evidence offered did not corroborate Gracey on either of these matters and was properly excluded.

■ Did the court err in refusing a commission to take the testimony of Kelso Journey? At the close of appellants' rebuttal evidence, appellants' counsel advised the court that Kelso Journey, a witness absent without negligence on the part of appellants or their counsel, had become an important witness because Johnston, while admitting that he visited the office of prosecuting attorney Kelso Journey, had denied that he told Journey he had signed the alleged contract. Counsel stated he wanted Journey's testimony to impeach Johnston's testimony, since Journey would testify that Johnston admitted to him he signed the contract, and further stated the contract was not in existence and had been torn up. Journey was said to be "in the armed

forces and off the coast of Georgia'' and a commission was asked to take his deposition, the deposition to be included as part of appellants' evidence. The request was denied. It is conceded that, since 1943, appellants had been fully advised as to Journey's testimony and had full knowledge of his absence when they announced ready for trial. There is no suggestion that anyone was surprised by Johnston's denial of the alleged admission. It is conceded that the matter was within the court's discretion. No abuse of that discretion appears.

Was the order approving the contract of sale obtained by extrinsic fraud? ''The rule is well settled that a court of equity will not interfere with a judgment at law unless there was fraud in the procurement of the judgment extrinsic or collateral to the matters tried upon which the judgment was rendered. . . . It is also well settled that giving false evidence is held not to be such fraud as will authorize equity to vacate a judgment.'' Sutter v. Easterly, 354 Mo. 282, 189 S. W. (2d) 284, 287.

''A judgment cannot be set aside on the ground of fraud unless it is shown that fraud was practiced in the very act of obtaining the judgment; that the fraud went to the manner in which the judgment was procured rather than operating upon matters pertaining to the judgment itself; that the fraud prevented the unsuccessful party from presenting his case or defense; or that the fraud otherwise went to extrinsic, collateral acts or matters not before the court for examination or determination in the suit or proceeding in which the judgment was rendered. . . . Such a proceeding cannot be used to obtain a further hearing upon matters, which were or could have been brought before the court to make a case or defense, either because the parties found further evidence bearing upon the truth or falsity of the testimony there, or because the parties neglected to litigate such matters in the original case. 'Courts of equity do not grant such relief for the purpose of giving the defeated party a second opportunity to be heard on the merits of the case.' '' Hockenberry v. Cooper County State Bank, 338 Mo. 31, 88 S. W. (2d) 1031, 1036.

The issues tried and determined upon the application for approval of the sale appear from the face of the judgment, towit, ''that the sale of said assets is to the best interests of said Trust, its creditors, depositors, and stockholders, and that the same is for a fair and reasonable value, and the best and highest bid thereon obtainable by the said commissioner of finance, his agents, servants and employees.'' On the basis of that finding the contract was approved. The chancellor below was not called upon to retry the issues which were determined by the judgment. Unless there was more than false testimony, misrepresentation or concealment in the hearing of evidence on the issues in that case, there can be no relief in equity.

''Equitable relief from a judgment is denied in cases of intrinsic fraud, on the theory that an issue which has been tried and passed

upon in the original action should not be retried in an action for equitable relief against the judgment, and that otherwise litigation would be interminable; relief is granted for extrinsic fraud on the theory that by reason of the fraud preventing a party from fully exhibiting and trying his case, there never has been a real contest before the court of the subject matter of the action.'' 31 Am. Jur., Judgments, Sec. 655, p. 232.

The matter of a secret agreement between Johnston and Gaskill to share the profits from a further liquidation of the bank's assets, and the matter of Johnston requesting the court to approve a sale of the bank's assets to his alleged partner, were not tried or determined by the judgment sought to be set aside. Of course, ''it is always fraudulent for one in a position of confidential relationship with another to persuade such person, trusting in his counsel, to make a transaction beneficial to him, but against the interest of the person relying upon his advice, without fully disclosing all material facts.'' Hockenberry v. Cooper County State Bank, supra, (88 S. W. (2d) 1031, 1036). The issue of fraud in the respects mentioned is the primary matter for consideration of this court.

We think the cause turns upon the credibility of Gracey, Cole and Houtchens and the weight and value to be given to their testimony. If their testimony is true, then there are many facts and circumstances in evidence which tend to corroborate them. If their testimony is false then these other facts and circumstances in evidence are wholly insufficient to sustain a finding for appellants. Many, if not all, of these facts and circumstances are quite as consistent with innocence and fair dealing as with fraud and dishonesty. In any case, the facts and circumstances relied upon by appellants, without the aid of the oral testimony of the witnesses mentioned, or some of them, are wholly insufficient to justify or authorize a court of equity in granting the relief requested. Elliott v. McCormick, 323 Mo. 263, 19 S. W. (2d) 654, 658; State ex rel. Sterling v. Shain, 344 Mo. 891, 129 S. W. (2d) 1048, 1051; Terminal R. R. Ass'n. v. Schmidt, 349 Mo. 890, 163 S. W. (2d) 772, 774. The trial chancellor was in a far better position to determine the credibility of the witnesses mentioned and the weight and value to be given to their testimony than an appellate court. We defer to his finding.

The judgment is affirmed. *Bradley* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.